# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### 1:18-CV-00741

| | | |
|---|---|---|
| CHARLES WILLIS SHORT, individually and as Administrator of the Estate of VICTORIA CHRISTINE SHORT, <br><br> Plaintiff, <br><br> v. <br><br> ANDREW C. STOKES, SHERIFF of DAVIE COUNTY in his individual and official capacity; J.D. HARTMAN, SHERIFF OF DAVIE COUNTY, in his individual and official capacity; CAMERON SLOAN, CAPTAIN, Chief Jailer with the Davie County Sherriff's Department, in his individual and official capacity; DANA RECKTENWALD, LIEUTENANT, Operations Supervisor of the Detention Center with the Davie County Sherriff's Department, in her individual and official capacity; TERESA MORGAN a/k/a TERESA M. GODBEY, SERGEANT Jailer-Detention Officer with the Davie County Sheriff's Department, in her individual and official capacity; CRYSTAL MEADOWS, SERGEANT Detention Officer with the Davie County Sheriff's Department in her individual and official capacity; MATTHEW TRAVIS BOGER, Jailer-Detention Officer with the Davie County Sherriff's Department, in his individual and official capacity; JOHN or JANE DOES 1-5, Jailers-Detention Officers with the Davie County Sherriff's Department, in their individual and official capacities; SOUTHERN HEALTH PARTNERS, INC.; LINDA BARNES, LPN, in her individual and official capacity; SUSAN DESIREE BAILEY, LPN, in her individual and official capacity; MANUEL MALDONADO, P.A., in his individual and official capacity; and WESTERN SURETY COMPANY, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **AMENDED COMPLAINT** <br> (Jury Trial Demanded) |

COMES NOW Plaintiff Charles Short, by and through his undersigned counsel, complaining of Defendants hereby alleges and says the following:

**STATEMENT OF THE CASE**

Good policies work. But only when public employees who must use them do. When a public employee who must execute a policy instead chooses to ignore and violate it, and that choice leads directly to the harm that properly executing it should and would have prevented, that public employee is responsible for the harm he or she causes.

Sheriff Stokes had a policy to identify and prevent inmates in his custody at the Davie County Detention Center ("Jail") from committing suicide. The policy is not complex. It is written in plain language that any normal person can understand. It has a few simple steps and checklists to ensure that an inmate does not commit suicide at the Jail. By its very words, it requires every person who works at the Jail to know and apply it. When those people who must apply it do, it works. They chose not to with Victoria. She died.

On August 23, 2016, Sheriff Stokes' deputy arrested Victoria, a mother and wife, and took her to his Jail. Over the next two days, the detention officers, LPNs, PA, and everyone else who came into contact with Victoria while she was under Sheriff Stokes' custody and control at the Jail chose to violate most, if not all, of the simple requirements of the Sheriff's suicide prevention policy. The catastrophic choices by Sheriff Stokes' employees and agents led directly to Victoria's entirely preventable death. All of them must be held responsible for the harm they caused as a direct result of their choices.

During the intake process, Sheriff Stokes' employees and agents failed to recognize several obvious risk signs that should immediately cause them to send Victoria to a

2

consultation with a qualified mental health doctor. At a minimum, they should have sent Victoria to a hospital or another emergency facility with appropriate mental health providers to care for her. Instead, they ignored the policy's requirements and placed Victoria in an isolation cell with inadequate observation and gave her a bedsheet.

Soon after they gave Victoria the very means to attempt suicide, predictably, she tried. Sheriff Stokes' employees and agents next tried to clumsily cover up their violations. One of Sheriff Stokes' employees conducted a woefully inadequate whitewash of an internal investigation. Not surprisingly, that employee concluded that no one did anything wrong. That facade was later refuted.

Sheriff Stokes failed to report the facts and circumstances of Victoria's death to the responsible state investigatory agency, that agency being the North Carolina Department of Health and Human Services Division of Heath Service Regulation (DHSR). Only after a newspaper reporter started asking questions to Sheriff Stokes' replacement[1], Sheriff Hartman, about Victoria's death did Sheriff Hartman finally report it to the DHSR. When that the DHSR finally conducted its review, it found that Sheriff Stokes and his employees and agents violated several of his policies. It concluded that these violations led directly to Victoria's death. This willful attempt to avoid responsibility for causing Victoria's preventable death showed that Sheriff Stokes, Sheriff Hartman, and their employees and agents had no remorse and instead were still trying to minimize their direct responsibility for this tragedy. They should not get away with this.

---

[1] Sheriff Stokes retired on December 31, 2016, and Chief Deputy J.D. Hartman became Sheriff of Davie County.

Case 1:18-cv-00741-LCB-JLW   Document 6   Filed 09/05/18   Page 3 of 76

Justice demands appropriate recognition of their choices to violate the policy and how those choices led to Victoria's entirely preventable death. Victoria and her family deserve to have the truth told about what Sheriff Stokes, Sheriff Hartman, and his employees and agents did and why they chose to let her die. No family should ever again have to suffer this avoidable tragedy. The community expects that a powerful man like Sheriff Stokes will keep people safe, not allow them die an unnecessary death and then try to cover it up.

## PARTIES

1.      Plaintiff Charles Short is an adult, widower, resident of Davie County, North Carolina, and is under no legal disability.

2.      Charles is the Administrator of the Estate of Victoria Christine Short. Charles was married at the time of Victoria's death. Sheriff Stokes allowed Victoria to attempt suicide on August 24, 2016, while she was in in his custody at the Jail. As a result, she later died at Wake Forest Baptist Medical Center on September 7, 2016.

3.      At all relevant times, Defendant Sheriff Andy Stokes was a resident of Davie County, North Carolina and was the elected Sheriff of Davie County pursuant to Article VII, Section 2 of the North Carolina Constitution and N.C. Gen. Stat. § 162-1. Sheriff Stokes resigned as Sheriff of Davie County on December 31, 2016. Charles sues Sheriff Stokes in his individual capacity and official capacity. Sheriff Stokes was:

        a.      In control of the Jail;

        b.      The final decision-making authority over law enforcement policies and officers, deputies, employees, agents at the Jail, and personnel who worked for the Sheriff's Department;

c. Directly responsible for the appointment, retention, supervision, training, and conduct of his officers, deputies, employees, and agents;

d. Acting in the course and scope of his official duties as Sheriff of Davie County and under color of state law;

e. Responsible for the care and custody of the Jail;

f. Responsible for the care and custody of inmates and detainees in the Jail, including Victoria;

g. The keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55, and he appointed other keepers of the Jail; and

h. Vicariously liable for the actions of his agents, employees, officers, deputies, supervisors, managers, jailors, and anyone else who worked in the Jail.

4. At all relevant times, Defendant Sheriff J.D. Hartman was a resident of Davie County, North Carolina. Prior to January 1, 2016, he was Sheriff Stokes' Chief Deputy. On January 1, 2016, Chief Deputy Hartman became interim Sheriff of Davie County and on January 4, 2016, he was appointed Sheriff of Davie County pursuant to Article VII, Section 2 of the North Carolina Constitution and N.C. Gen. Stat. § 162. Charles sues Sheriff Hartman in his individual capacity and official capacity. Sheriff Hartman was:

a. In control of the Jail after he became Sheriff;

b. Charged with the supervision of all of the officers, deputies, employees, and agents in the Jail;

c. The final decision-making authority over law enforcement policies and officers, deputies, employees, agents at the Jail, and personnel who worked for the Sheriff's Department;

d. Directly responsible for the appointment, retention, supervision, training, and conduct of his officers, deputies, employees, and agents;

5

e.      Acting in the course and scope of his official duties as Chief Deputy and later Sheriff of Davie County and under color of state law;

f.      Responsible for the care and custody of the Jail;

g.      Responsible for the care and custody of inmates and detainees in the Jail, including Victoria;

h.      The keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55, and he appointed other keepers of the Jail; and

i.      Vicariously liable for the actions of his agents, employees, officers, deputies, supervisors, managers, jailors, and anyone else who worked in the Jail.

5.      At all relevant times, Defendant Captain Cameron Sloan was a resident of Yadkin County, North Carolina and was employed by Davie County or the Sheriff as the Chief Jailer with the Davie County Sheriff's Office. Charles sues Captain Sloan in his individual capacity and official capacity as the Chief Jailer. Captain Sloan was:

a.      Charged with the supervision of all of the officers, deputies, employees, and agents in the Jail;

b.      The final decision-making authority over law enforcement policies and officers, deputies, employees, and agents at the Jail;

c.      Directly responsible for the appointment, retention, supervision, training, and conduct of his officers, deputies, employees, and agents at the Jail;

d.      Acting in the course and scope of his official duties as an employee of the Sheriff of Davie County and under color of state law;

e.      Responsible for the care and custody of inmates and detainees in the Jail, including Victoria;

f.      A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and

g.      An agent and employee of Sheriff Stokes and Sheriff Hartman.

6

6.    At all relevant times, Defendant Lieutenant Dana Recktenwald was a resident of Davie County, North Carolina and was employed by Davie County or the Sheriff as the Operations Supervisor at the Detention Center with the Davie County Sheriff's Office. Charles sues Lt. Recktenwald in her individual capacity and official capacity as the Operations Supervisor. Lt. Recktenwald was:

      a.    Charged with the supervision of all of the operational aspects of the Jail, including those of all of the officers, deputies, employees, and agents in the Jail;

      b.    Directly responsible for the appointment, retention, supervision, training, and conduct of her officers, deputies, employees, and agents at the Jail;

      c.    Acting in the course and scope of her official duties as an employee of the Sheriff of Davie County and under color of state law;

      d.    Responsible for the care and custody of inmates and detainees in the Jail, including Victoria;

      e.    A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and

      f.    An agent and employee of Sheriff Stokes and Sheriff Hartman.

7.    At all relevant times, Defendant Sergeant Teresa Morgan (a/k/a Teresa M. Godbey) was a resident of Davie County, North Carolina and was employed by Davie County or the Sheriff. Charles sues Sgt. Morgan in her individual capacity and in her official capacity as Sergeant with the Davie County Sheriff's Department. Sgt. Morgan was:

      a.    Charged with the supervision of certain officers, deputies, employees, and agents in the Jail;

      b.    Directly responsible for the supervision, training, and conduct of certain officers, deputies, employees, and agents at the Jail;

7

c.   Acting in the course and scope of her official duties as an employee of the Sheriff of Davie County and under color of state law;

d.   Responsible for the care and custody of inmates and detainees in the Jail, including Victoria;

e.   A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and

f.   An agent and employee of Sheriff Stokes and Sheriff Hartman.

8.   At all relevant times, Defendant Sergeant Crystal Meadows was a resident of Davie County, North Carolina and was employed by Davie County or the Sheriff. Charles sues Sgt. Meadows in her individual capacity and in her official capacity as Sergeant with the Davie County Sheriff's Department. Sgt. Meadows was:

a.   Charged with the supervision of certain officers, deputies, employees, and agents in the Jail;

b.   Directly responsible for the supervision, training, and conduct of certain officers, deputies, employees, and agents at the Jail;

c.   Acting in the course and scope of her official duties as an employee of the Sheriff of Davie County and under color of state law;

d.   Responsible for the care and custody of inmates and detainees in the Jail, including Victoria;

e.   A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and

f.   An agent and employee of Sheriff Stokes and Sheriff Hartman.

9.   At all relevant times, Defendant Officer Matthew Travis Boger was a resident of Davie County, North Carolina and was employed by Davie County or the Sheriff as a Detention Officer with the Davie County Sheriff's Office. Charles sues Officer Boger in his individual capacity and official capacity as a Jailer. Officer Boger was:

8

<ol type="a">
<li>Charged with the supervision of certain officers, deputies, employees, and agents in the Jail;</li>
<li>Directly responsible for the supervision, training, and conduct of certain officers, deputies, employees, and agents at the Jail;</li>
<li>Acting in the course and scope of his official duties as an employee of the Sheriff of Davie County and under color of state law;</li>
<li>Responsible for the care and custody of inmates and detainees in the Jail, including Victoria;</li>
<li>A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and</li>
<li>An agent and employee of Sheriff Stokes and Sheriff Hartman.</li>
</ol>

10. At all relevant times, Defendants John or Jane Does 1-5 were residents of Davie County, North Carolina and were employed by Davie County or the Sheriff as Detention Officers with the Davie County Sheriff's Office. Charles sues Defendants John or Jane Does 1-5 in their individual capacities and official capacities as Jailers. Each one of Defendants John or Jane Does 1-5 was:

<ol type="a">
<li>Charged with the supervision of certain officers, deputies, employees, and agents in the Jail;</li>
<li>Directly responsible for the supervision, training, and conduct of certain officers, deputies, employees, and agents at the Jail;</li>
<li>Acting in the course and scope of his or her official duties as an employee of the Sheriff of Davie County and under color of state law;</li>
<li>Responsible for the care and custody of inmates and detainees in the Jail, including Victoria;</li>
<li>A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and</li>
<li>An agent and employee of Sheriff Stokes and Sheriff Hartman.</li>
</ol>

9

11.    Upon information and belief and at all relevant times, Defendant Southern Health Partners ("SHP") was a foreign medical corporation based in Chattanooga, Tennessee that provided medical services to inmates and detainees held in Sheriff Stokes' custody at the Jail by way of a contract with Sheriff Stokes and, later, Sheriff Hartman and Davie County. SHP does not appear to be registered as an active corporation that is registered with North Carolina Medical Board as is required for a professional corporation engaged in the practice of medicine under North Carolina law.

12.    At all relevant times, Defendant Linda Barnes was, upon information and belief, a licensed practical nurse ("LPN") who provided medical care to inmates and detainees held in Sheriff Stokes' custody at the Jail and was an employee and agent of SHP and Sheriff Stokes and Sheriff Hartman. Charles sues LPN Barnes in her individual capacity and in her official capacity. At all relevant times, LPN Barnes was:

a.    Charged with the supervision of the health care providers who provided care to inmates and detainees held in custody at the Jail including, but not limited to, the specific medical care providers and detention officers who provided medical care to Victoria in August 2016 as described below;

b.    Charged with the care, custody, and safekeeping of inmates and detainees held in custody at the Jail, including Victoria;

c.    A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55;

d.    An agent and employee of SHP; and

e.    An agent or employee of Sheriff Stokes and Sheriff Hartman.

13.    At all relevant times, Defendant Susan Desiree Bailey was an LPN who provided medical care to inmates and detainees held in custody at the Jail and was an

10

employee and agent of SHP and Sheriff Stokes and Sheriff Hartman. Charles sues LPN Bailey in her individual capacity and in her official capacity. At all relevant times, LPN Bailey was:

    a.    Charged with the supervision of the health care providers who provided care to inmates and detainees held in custody at the Jail including, but not limited to, the specific medical care providers and detention officers who provided medical care to Victoria in August 2016 as described below;

    b.    Charged with the care, custody, and safekeeping of inmates and detainees held in custody at the Jail, including Victoria;

    c.    A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55;

    d.    An agent and employee of SHP; and

    e.    An agent or employee of Sheriff Stokes and Sheriff Hartman.

14.    Upon information and belief and at all relevant times, Defendant Manuel Maldonado, P.A. was a Physician's Assistant who provided medical care to inmates and detainees held in custody at the Jail and was an employee and agent of SHP and Sheriff Stokes and Sheriff Hartman. Charles sues PA Maldonado in his individual capacity and in his official capacity. At all relevant times, PA Maldonado was:

    a.    Charged with the supervision of the health care providers who provided care to inmates and detainees held in custody at the Jail including, but not limited to, the specific medical care providers and detention officers who provided medical care to Victoria in August 2016 as described below;

    b.    Charged with the care, custody, and safekeeping of inmates and detainees held in custody at the Jail, including Victoria;

    c.    A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55;

    d.    An agent and employee of SHP; and

e. An agent or employee of Sheriff Stokes and Sheriff Hartman.

15. At all relevant times, SHP employed LPN Barnes, LPN Bailey, PA Maldonado, and all other health care providers who provided medical services in the Jail in August 2016, making SHP liable for any negligent acts by these employees pursuant to the doctrine of *respondeat superior*.

16. At all relevant times, Western Surety Company ("Western Surety") was a corporation organized and existing under the laws of the State of South Dakota. Western Surety provides a Bond that covered Sheriff Stokes and Sheriff Hartman as Sheriff of Davie County as required by N.C. Gen. Stat. §§ 162-8 and 58-72-1, *et sequ.*, for $10,000.

## WAIVER OF IMMUNITY

17. The allegations in the Paragraphs above are incorporated by reference.

18. At all relevant times, to the extent that any or all Defendants claim they are a municipal or government or county-owned, operated, or funded entity or an employee or agent of such entity, all such Defendants waived any potential governmental immunity or sovereign immunity defense for any of the acts or omissions alleged in this Complaint.

19. All individual Defendants are specifically sued in their individual capacity and in their official capacity.

20. To the extent that there is any claim made by the non-law enforcement Defendants, including SHP, LPN Barnes, LPN Bailey, and PA Maldonado, that they are not subject to the claims in this Complaint because they were not employees of the County or Sheriff Stokes or Sheriff Hartman, this has been waived. Charles specifically pleads the

12

non-delegable duty owed to an inmate or detainee by a Sheriff, or his employee or all keepers of the jail as a waiver of such a claim or defense.

21.     To the extent that Sheriff Stokes or Sheriff Hartman makes any claim that he is not responsible for the actions of the non-law enforcement Defendants, including SHP, LPN Barnes, LPN Bailey, and PA Maldonado, because they were hired under a contract and not as direct employees, this has been waived. Charles specifically pleads the non-delegable duty owed to an inmate or detainee by a Sheriff, or his employee or all keepers of the jail as a waiver of such a claim or defense and that Sheriff Stokes and Sheriff Hartman are vicariously liable for their actions and that they are acting under color of state law like the rest of Sheriff Stokes and Sheriff Hartman's employee or all keepers of the jail.

22.     In the alternative, at all relevant times, Sheriff Stokes and Sheriff Hartman, and any and all agents, employees, officers, nurses, jailers, deputies, or other health care providers who worked for them at the Jail, waived any potential governmental immunity or sovereign immunity defense to the extent that they had any additional bonds or insurance or participated in any local governmental risk pool pursuant to N.C. Gen. Stat. §§ 153A-435 and 58-23 that might cover any acts or omissions alleged in this Complaint.

23.     Western Surety furnished a bond or bonds pursuant to N.C. Gen. Stat. § 162-8 and an additional bond covering Sheriff Stokes and Sheriff Hartman, Western Surety is named as a Defendant to this action, pursuant to N.C. Gen. Stat. § 58-72-1, *et seq*.

24.     At all relevant times, Sheriff Stokes and Sheriff Hartman, and any and all of their agents, employees, officers, nurses, PAs, jailers, deputies, or other health care

13

providers who worked at the Jail, including all of the named and unnamed John and Jane Doe Defendants, waived any potential governmental immunity or sovereign immunity defense that could have been raised to the Complaint by virtue of Western Surety's bonds and liability insurance policies to the extent of such bonds or policies.

25.     At all relevant times, Sheriff Stokes and Sheriff Hartman, and any and all of their agents, employees, officers, nurses, PAs, jailers, deputies, or other health care providers who worked at the Jail, including all of the named and John and Jane Doe Defendants, waived any potential qualified immunity defense. To the extent that Defendants have not expressly waived any qualified immunity defense, no such defense can apply given the overt negligent and grossly negligent violations of Victoria's constitutionally-protected rights while she was in the custody and control of Sheriff Stokes and all of the other Defendants. It was already well-established in August 2016 that employees and agents of a Sheriff working at the Jail had to provide a potentially suicidal inmate or detainee with appropriate medical treatment and observation. It was already well-established in August 2016 that employees and agents of a Sheriff working at the Jail should not place an inmate or detainee with known risks of being suicidal in an isolation cell by herself with observation occurring only every 30 minutes or so and giving her a bedsheet that they knew she could use to hang herself. There can be no question that there was an actual policy directly on point that they chose to ignore or willfully violated its simple instructions. This was intentional and reckless disregard for her safety.

26.     Upon information and belief and at all relevant times, Sheriff Stokes and Sheriff Hartman, and any and all of his agents, employees, officers, nurses, PAs, jailers,

deputies, or other health care providers who worked at the Jail, including all of the named and John and Jane Doe Defendants, waived any potential public official immunity defense. To the extent that Defendants have not expressly waived any public official immunity defense, no such defense can apply. These Defendants' overt, grossly negligent violations of the simple, effective-when-used policy that Sheriff Stokes enacted and all of them should have applied to prevent Victoria from attempting suicide while she was in the custody and control of Sheriff Stokes and all of the other Defendants shows that they acted with malice, willfulness, and reckless disregard of her safety. These Defendants' conduct was willful and wanton, malicious, and a reckless and egregious disregard of the easily applied policy that would have unquestionably prevented her from dying while at the Jail.

## JURISDICTION AND VENUE

27. The allegations in the Paragraphs above are incorporated by reference.

28. All events that form the basis of this Complaint took place in Davie County, North Carolina which is in the United States District Court for the Middle District of North Carolina.

29. This Court has original jurisdiction over the subject matter and parties of this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

30. This Court has supplemental jurisdiction over any state-law based claims in this action pursuant to 28 U.S.C. § 1367.

31. This Court has venue in this action pursuant to 28 U.S.C. § 1391.

## FACTS

32. The allegations in the Paragraphs above are incorporated by reference.

33. On July 6, 2016, Deputy Hannah Whittington of the Davie County Sheriff's Department ("Sheriff's Department") was dispatched to 3063 US Highway 64 around Mocksville, NC to respond to a call about a person who was suicidal.[2] Charles met Deputy Whittington when he arrived at Charles and Victoria's home at that address. Charles told Deputy Whittington that Victoria had taken pills and walked out into the woods. Charles explained that he feared she might try to commit suicide and that she needed help.

34. Deputy Whittington found Victoria in the woods nearby and told her that she had taken a large number of prescription medicine pills. Deputy Whittington noted that Victoria said that she "was just doing what anyone would want to do when they were ready to leave this world."

35. Deputy Whittington recognized that this was a medical emergency because Victoria was in the process of making a sincere attempt to commit suicide. Deputy Whittington called EMS to help take Victoria to seek emergency mental health treatment and prevent her from attempting to commit suicide.

36. EMS arrived at Charles and Victoria's home and transported Victoria by ambulance to Forsyth County Hospital. It was determined that she had taken between 50-100 pills during this suicide attempt.

37. Victoria spent four days receiving in-patient treatment for her attempted suicide at the hospital.

---

[2] (Incident report for DCSD case number OCA160700097, Attached as Ex. A.)

16

38.     A few weeks later, at approximately 11:45 pm on August 22, Deputy Moxley and Corporal Tellinger, both employees of the Sheriff's Department, returned to Charles and Victoria's home related to a call about a heated argument between them.[3]

39.     Deputy Moxley noted in his report that Victoria was "extremely upset and appeared to be on some type of narcotic as she was shaking uncontrollably, twitching from the neck area, and had needle marks all down both her arms." Deputy Moxley also wrote that Victoria told him she used a syringe found in the kitchen to "shoot up Xanax pills" and that she had not shot up since yesterday. Victoria told Deputy Moxley that "she was having withdraws from shooting up and when I asked her if she needed EMS to come check her out she advised she did not. Victoria advised that she had not shot up since yesterday."

40.     The Sheriff's deputies took both Charles and Victoria into custody and transported them to the Jail.

41.     As the Sheriff's deputies transported Victoria to the Jail, both Charles and his brother-in-law, Dwight Ross, told the Sheriff's deputies that Victoria was suicidal and had recently attempted suicide.

42.     When Victoria arrived at the Jail at around midnight on August 23, she appeared before Magistrate Miller. Magistrate Miller placed Victoria on a forty-eight hour domestic hold and did not set a bond.

---

[3] (Incident report for DCSD case number OCA160800422, Attached as Ex. B.)

43.     For some reason, the Sheriff's deputies placed Charles in a side cell when they got him to the Jail. He sat in that cell for about 4-5 hours until he had a video first appearance. He was released following his first appearance.

44.     Victoria should have been released around midnight on August 25.

45.     After the magistrate ordered that Victoria be held on a forty-eight hour domestic hold, Sheriff Stokes' employees began her in-processing to be held in custody.

46.     Around 12:09 am on August 23, 2018, LPN Barnes completed a Medical Staff Receiving Screening form for Victoria.[4] LPN Barnes noted on the form that Victoria:

- **NO: did not** show signs of illness, injury,…or other symptoms suggesting the need for immediate emergency medical referral;

- **YES: did have** visible signs of…skin lesions, rash, infection: cuts, bruises, or minor injuries; needle marks… LPN Barnes hand wrote "scabs/sores on face, arms, legs, trunk."

- **BLANK: DID NOT SAY YES OR NO** to the question that asked if LPN Barnes visually or medically observed whether Victoria exhibited any signs that suggest the risk of suicide, assault, or abnormal behavior.

- **YES: did have** visible signs that Victoria appeared to be under the influence of, or withdrawing from drugs or alcohol LPN Barnes hand wrote "drugs."

- **NO: did not** note that Victoria had been treated for mental health problems;

- **YES: did have** hospitalization by a physician or psychiatrist within the last year, LPN Barnes handwrote "month ago-suicide attempt."

- **YES: has** considered or attempted suicide, LPN Barnes hand wrote "July 2016."

---

[4] (Medical Staff Receiving Screening Form, dated 08/23/2016, Attached as Ex. C.)

18

- **YES: does use drugs** LPN Barnes hand wrote the following about how often, what kind, last time, and how much "daily; heroine, Xanax, opana; 2 days ago; ½ a gram heroine/day."

- **YES: does use alcohol** LPN Barnes hand wrote "daily; liquor; 2 days ago; pint;"

- **BLANK: DID NOT SAY YES OR NO:** At the bottom of this form, the following question was posed for LPN Barnes: "Have all concerns from officer intake and above answers been explained above?" LPN Barnes left that response line blank;

- The next line invited LPN Barnes to provide her **remarks**. She wrote, "**NVD** [which means Victoria suffered from nausea, vomiting, and diarrhea] **per PAC- ETOH/Benzo/Opiate** [that means alcohol and drug] **detox protocol with withdrawal monitoring**."

47. Around midnight of August 23, LPN Barnes completed a separate form, the Clinical Institute Withdrawal Assessment of Alcohol Scale form ("CIWA Form").[5] Again, LPN Barnes noted in her own hand writing that Victoria used: "liquor, benzo, opiates; pint or ½ g on a daily basis and had last used 2 days ago." In the evaluation form, she noted that Victoria displayed the following symptoms of withdrawal:

- **Nausea and Vomiting**: 5 out of 7 [4 is: intermittent nausea with dry heaves. 7 is the worst with constant nausea, frequent dry heaves and vomiting.];

- **Tremor**: 5 out of 7 [4 is: moderate, with patient's arms extended. 7 is the worst: severe, even with arms not extended.];

- **Paroxymal Sweats**: 3 out of 7 [0 is: no sweat visible. 1 is: barely perceptible sweating, palms moist. 4 is: beads of sweat obvious on forehead.];

- **Anxiety**: 6 out of 7 [4 is: moderately anxious, or guarded, so anxiety is inferred. 7 is the worst: equivalent to acute panic states as seen in severe delirium or acute schizophrenic reactions.];

---

[5] (CIWA form, dated 08/23/2016, Attached as Ex. D.)

- **Agitation**: 4 out of 7 [4 is: moderately fidgety and restless.];

- **Tactile Disturbances**: 4 out of 7 [4 is: moderately severe hallucinations. This is in contrast to 3 which is: moderate itching, pins and needles, burning or numbness. If a patient registers as a 4 instead of a 3, her symptoms have moved beyond just unusual skin sensation and into the realm of hallucinations.];

- **Auditory Disturbances**: 3 out of 7 [3 is: moderate harshness or ability to frighten. This is in the context of Victoria's responses to the following questions from LPN Barnes: "Are you more aware of sounds around you? Are they harsh? Do they frighten you? Are you hearing anything that is disturbing to you? Are you hearing things you know are not there?"];

- **Visual Disturbances**: 3 out of 7 [3 is: moderate sensitivity.]; and

- **Orientation and Clouding of Sensorium**: 1 out of 4 [1 is: cannot do serial additions or is uncertain about the date.].

48.     At the bottom of the CIWA form, there is a box that instructs the scorer as follows: "Patients scoring less than 10 do not usually need additional medication for withdrawal. Review with your Medical Director/Physician." Any score higher than 21 is considered evidence of severe withdrawal.

49.     LPN Barnes scored Victoria as a 34 on the CIWA form. That means that Victoria scored much higher than the lowest qualifying score for severe withdrawal.

50.     It does not appear from any of the medical records that LPN Barnes reviewed this CIWA form, or any other information, with the Medical Director or any physician prior to Victoria acting on her suicidal tendencies the next day. If that had happened, a record of any such interaction or conversation should have been created.

51.     Despite the obvious and overt risks of Victoria possibly attempting to commit suicide, LPN Barnes did not place Victoria on suicide watch. It does not appear that LPN Barnes ever bothered to ask a doctor whether that might be appropriate.

52.     It appears that only LPN Barnes performed the medical decision-making to decide what level of care Victoria needed. There does not appear to be any evidence that LPN Barnes ever consulted a physician in that process.

53.     It appears that no physician ever saw Victoria from the time she got to the Jail until the time she left in the back of an ambulance some 34 hours later.

54.     There is some indication from the internal investigation after the suicide that, in the early morning hours of August 23, LPN Barnes spoke by phone with Manuel Maldonado, a physician's assistant—not a doctor—after conducting the intake for Victoria. There do not appear to be any notes that confirm this phone call other than a brief notation on an SHP Doctors Orders form that LPN Barnes wrote in her own handwriting: "TO VORB: MMaldonado  PAC/Linda Barnes LPN."[6]

55.     It also appears from a different version of the same form that someone initialed this line on September 12, 2016.[7] It is unclear whose initials those are or whether those are PA Maldonado's initials. Even if it is PA Maldonado's initials, Victoria died on September 7, five days before he may have signed off on this note. So if he initialed it, he did so after she had been dead for almost a week.

---

[6] (SHP Doctors Orders form, dated 08/23/2016, Attached as Ex. E.)
[7] (SHP Doctors Orders form, signed 09/12/2016, Attached as Ex. F.)

56.     In any event, there is no indication or record that a doctor, or a physician's assistant or even a registered nurse, ever placed eyes or hands on Victoria during her time at the Jail or signed a single piece of paper acknowledging any contact with or treatment plan for Victoria. The only medical care providers who actually saw Victoria with their own eyes during her time in the Jail appears to be two LPNs, at least until the EMS team started trying to resuscitate her in the last few minutes she was there.

57.     If PA Maldonado had contact with LPN Barnes in the early morning hours of August 23 and became aware of just a portion of the information in Victoria's intake forms, he should have immediately known that she posed a serious risk of suicide based on that information contained in LPN Barnes' intake forms. If PA Maldonado did know about Victoria's situation, he failed to recognize Victoria's high suicide risk and took no action to comply with the policies that would have prevented that.

58.     If LPN Barnes spoke to PA Maldonado in the early morning hours of August 23 and did not make him aware of the information in Victoria's intake forms, then LPN Barnes failed to provide critical, life-threatening information to him as she was required to do according to the Sheriff's policy. That would be a failure by her and her supervisors who are responsible for training her and ensuring that she performs her job correctly.

59.     On the SHP Physicians Order that LPN Barnes completed, the first line orders Victoria's detox protocol for alcohol, benzodiazepine and opiates. That proves, yet again, that the Jail and medical providers knew that Victoria suffered from a complex withdrawal situation involving several different types of drugs. This type of multiple-drug-

withdrawal requires intense monitoring, typically in an in-patient setting, and always with proper doctor supervision. None of that occurred at the Jail for Victoria.

60.    Later, during the internal investigation after Victoria's death, LPN Barnes apparently told Sgt. Kimel that, when she conducted Victoria's intake, Victoria, "was doubled over in pain while sitting in the chair due to abdominal pains." LPN Barnes failed to record any of that information in the intake forms described above. Understanding how Victoria looked and felt at the time of her intake was relevant information, but LPN excluded it until after Victoria died and a detective investigated her role in Victoria's death.

61.    Presumably, LPN Barnes also failed to tell this information to PA Maldonado if they spoke by phone in the early morning hours of August 23. If she failed to tell PA Maldonado, she should have. If LPN Barnes did tell him and he failed to take proper action based on it, he should have.

62.    On August 23, 2016, Sgt. Morgan completed and signed a form called the "Medical Questionnaire" about Victoria[8] and wrote in it:

- **NO: did not note** that Victoria had been treated for mental health problems in response to question #8;
- **NO: did not note** that Victoria had been hospitalized by a physician or psychiatrist within the last year in response to question #12;
- **YES: has considered or attempted suicide** in response to question #13 [and then to provide more information Sgt. Morgan entered the following] "**LAST MONTH**";
- **YES: did use drugs** in response to question #16 [and then to provide more information about what type, how much, how

---

[8] (Medical Questionnaire, dated 08/23/2016, Attached as Ex. G.)

Case 1:18-cv-00741-LCB-JLW   Document 6   Filed 09/05/18   Page 23 of 76

often, and last time, Sgt. Morgan entered the following] "**WHAT EVER CAN GET MY HANDS ON**";

- **YES: did use alcohol** in response to question #17 [and then to provide more information about what type, how much, how often, and last time, Sgt. Morgan entered the following] "**EVERY OTHER DAY**";

- **NO: is not** unconscious or showing visible signs of illness, injury,…or other symptoms suggesting the need for immediate emergency medical referral in response to question #18;

- **YES: did have** visible signs of…skin lesions, rash, infection: cuts, bruises, or minor injuries; needle marks… in response to question #19 [and then to provide more information Sgt. Morgan entered the following] "**SORES ALL OVER BODY**";

- **NO: did not note** that Victoria exhibited any signs that suggest the risk of suicide, assault, or abnormal behavior in response to question #20;

- **YES: did appear that Victoria was under the influence** of, or withdrawing from drugs or alcohol in response to question #21 [and then to provide more information, Sgt. Morgan entered the following] "**DRUGS**."

63.     At around 1:30 am on August 23, Sgt. Morgan completed an additional form, that is not titled or officially labeled, but appears to be some attempt at a mental health or suicide risk evaluation.[9] Sgt. Morgan or Victoria answered the eight questions on this form to determine Victoria's mental health status as follows:

(5)     Do you currently feel like you have to talk or move more slowly than you usually do? "**Yes**"

(6)     Have there currently been a few weeks where you felt like you were useless or sinful?  "**Yes**"

---

[9] (Mental Health or Suicide Risk Evaluation form, dated 08/23/2016, Attached as Ex. H.)

(8)    Have you ever been in a hospital for emotional or mental health problems? "**No – When I tried to com. suicide stayed in hospital 4 days**."

64.    The "Referral Instructions" at the bottom of this form stated "this detainee should be referred for further mental health evaluations if he/she answered: 1) Yes to item 7; 2) Yes to item 8; 3) Yes to at least 2 of the items 1 through 6; or 4) If you feel it is necessary for any other reason.

65.    Victoria answered "**YES**" for two of the questions in 1-6. Also, while whomever wrote the answer for question #8 technically wrote the word, "**NO**", Victoria's answer unmistakably and conclusively should have been considered a "yes." Based on the proper application of the instructions, Sgt. Morgan should have referred Victoria for further mental health evaluation. For some inexplicable reason, she did not.

66.    The form contains another box to check stating "NOT REFERRED" in the event that an inmate or detainee did not meet one of the 4 criteria for referral. Even if Sgt. Morgan had decided, in contravention to the score she tallied on this form, that Victoria should not be referred, she should have checked the "NOT REFERRED" box. Instead, Sgt. Morgan did nothing. She did not even bother to check the "NOT REFERRED" box.

67.    Under the section near the bottom of the page that asks for "Officers comments/impressions (CHECK ALL THAT APPLY)," Sgt. Morgan did not check the box for "under the influence of drugs/alcohol." She failed to check this box in spite of all of the earlier indications that Victoria was in fact under the influence of both drugs and alcohol starting with 1) Deputy Moxley's report at the house; then followed by 2) LPN Barnes recorded observations at the Jail, and then 3) even with Sgt. Morgan's own notation

25

on the other questionnaire form that she filled out, presumably, contemporaneously with this form. Sgt. Morgan either chose to not pay attention to this safety measure when she should have been doing her job, or even worse, she paid attention, but simply did not care, and chose to ignore the simple instructions. Either way, Sgt. Morgan's choice led to Victoria's death.

68.     Sheriff Stokes and later Sheriff Hartman's Jail policy section 4.10[10] states: "i. <u>When an inmate is identified as a suicide risk, the following will take place</u>: 1) Place in a populated cell, never place a risk inmate in a single cell. 2) Depending on the severity, the nurse will be notified. 3) Begin 10-15 minute checks and log them. 4) If an inmate has attempted suicide bring them up to the front, watch them continuously and call the nurse immediately who will contact Daymark Human Services." Sheriff Stokes' employees and agents should have followed simple safety policy. With no explanation and for no good reason, they did not.

69.     Following Sheriff Stokes' employees and agents' evaluation and process at intake, they placed Victoria in isolation cell number 7 at the Jail. She was the only person on the entire hallway. She sat in that cell by herself, without any other human contact for hours at a time other than the brief walk-by observations from the staff, mere seconds at a time and usually about 30 minutes or more apart.

70.     According to the internal investigation conducted by one of Sheriff Stokes' employees, Jail staff placed Victoria in isolation because she had "a multitude of sores all

---

[10] (Davie County Detention Center Policy 4.10, approved 03/04/2007, Attached as Ex. I.)

over her body, some of which were oozing fluid. She was isolated for the safety of the other inmates to avoid exposing them to a possible communicable disease." This information, collected after Victoria died and by someone who was later found to have performed an inadequate investigation, is not included in any of the medical or Jail paperwork written contemporaneously with Victoria's placement in isolation. This excuse for what happened only reared its head after Victoria died as a defense for why the staff failed to follow the simple Jail policy.

71.     Although an inappropriate level of care under the circumstances, LPN Barnes ordered Victoria to be placed on withdrawal protocols as she wrote on the SHP Physicians Order. (See Ex. E.) Specifically, LPN Barnes ordered that Victoria should undergo withdrawal monitoring until resolved. That did not happen. If it had, Victoria would not have been given the opportunity to commit suicide.

72.     Instead, the Jail staff took Victoria off of withdrawal monitoring without any doctor's order to do so. That also violates Jail policy.

73.     At some point on August 23, 2016, LPN Barnes authorized that Victoria could be moved to female isolation, allegedly due to having open draining sores all over her body. This occurred without any consultation or approval from a doctor, much less a physician's assistant or even a registered nurse. Apparently, a mere licensed practical nurse handled the decision about withdrawal and suicide protocols for detainees at the Jail.

74.     At some point between midnight of August 23 and 8 am of August 24, LPN Barnes' shift at the Jail ended, and LPN Bailey started her shift at the Jail.

27

75.     The withdrawal protocol required a medical provider to evaluate Victoria at least three times per day. The SHP medical staff at the Jail also failed to comply with that part of the withdrawal policy.

76.     Instead of seeing and evaluating Victoria at least three times per day, LPN Barnes evaluated Victoria once at the point of intake around midnight of August 23, 2016, as seen in the Flow Chart for Alcohol/Drug Withdrawal.[11] According to that Flow Chart, a medical provider did not see Victoria again until LPN Bailey saw her at about 8:30 am on August 24, 2016.

77.     Thus, about 32 hours elapsed without Victoria receiving any medical evaluation in violation of the directive on the top of the Flow Chart. She should have been seen and evaluated at least three additional times between 12:09 am on August 23 and 8:30 am on August 24.

78.     LPN Bailey apparently first saw Victoria around 7:15 am on August 24, 2016, when she gave Victoria medicine. Upon information and belief, LPN Bailey failed to review LPN Barnes' and Sgt. Morgan's medical intake forms which described Victoria's recent suicide attempt prior to or while she evaluated and provided treatment to Victoria. LPN Bailey never attempted to change any protocol, issue different instructions regarding Victoria, or speak to an actual doctor, much less a physician's assistant or even a registered nurse.

---

[11] (Flow Chart for Alcohol/Drug Withdrawal, Attached as Ex. J.)

79.    When LPN Bailey evaluated Victoria about an hour later, around 8:30 am on August 24, 2016, she noted that Victoria suffered essentially the same withdrawal symptoms noted by LPN Barnes 32 hours earlier. Despite the fact that there were only two evaluations taken over a day apart, they actually both documented overt and dangerous signs of withdrawal, in keeping with LPN Barnes findings recorded on the CIWA form, including: 1) weakness, 2) restlessness, 3) sweating, 4) shakiness/muscle twitching, 5) anxiety, 6) vomiting, 8) nausea, 9) slurred speech.

80.    According to the information that LPN Bailey recorded on the Flow Chart, Victoria had not improved at all. Despite her display of all of these symptoms on the only two occasions the LPNs evaluated her, and even then the persistence of all of these symptoms for at least 32 hours, the SHP medical staff and Jail employees did nothing. It is one thing to evaluate and record information about a patient in custody of the Jail, but when the evaluation should raise obvious alarm due to the findings, action should be taken to address the problems. Nobody did anything for Victoria other than move her to a secluded isolation cell and give her bed sheets that she could use to act on her suicidal intentions.

81.    LPN Bailey also noted that Victoria complained of being cold, having nausea, vomiting, diarrhea and restlessness. LPN Bailey stated that this was all just normal signs of withdrawal, so she took no further action to observe or evaluate Victoria or speak to an actual doctor, much less a physician's assistant or even a registered nurse.

82. Sara Cook, a detention officer who was working at the Jail in August 2016, came to work at 7 am on August 24 for a 12-hour shift. She arrived at the Jail at about 6:45 am that morning and participated in the shift change.[12]

83. During the shift change, the outgoing shift from the night before passed on information about the inmates and detainees in custody at that time to the new shift who were coming in to work.

84. Michael Brannock was a detention officer who worked at the Jail in August 2016. He had also been serving as a volunteer in the Davie County Volunteer Fire Department.

85. During the shift change around 7 am of August 24, 2016, Officer Cook heard Officer Brannock discuss how he had responded to Victoria's house for the call related to her suicide attempt in July 2016. He had done this in his capacity as a volunteer fireman.

86. Based on what Officer Brannock said that morning and her training and familiarity with the Sheriff's suicide prevention policy, Officer Cook became aware that Victoria posed a risk of suicide based on the earlier attempt in July. Officer Cook knew that she should follow the policy to prevent Victoria from having an opportunity to commit suicide. Officer Cook tried to follow the policy.

87. Shortly after the shift change, during which she heard about Victoria's risk of suicide, Officer Cook looked at the dry-erase board that showed where each inmate or detainee was currently being housed.

---

[12] (Affidavit of Sarah Cook, Attached as Ex. K.)

Case 1:18-cv-00741-LCB-JLW   Document 6   Filed 09/05/18   Page 30 of 76

88.     Officer Cook noticed that Victoria was in the back in a cell in the female isolation unit by herself. She knew that this was a violation of the Sheriff's suicide prevention policy because an at-risk detainee should not be housed alone, but should instead be in a populated area.

89.     Officer Cook also noticed that there was no detention officer assigned to the common area near the isolation unit, as would occur when a detainee is being observed four times an hour. She knew that this was a violation of the Sheriff's suicide prevention policy because an at-risk detainee should be observed at least four times an hour, not two.

90.     After she became aware of these violations, Officer Cook asked her supervisor, Sergeant Meadows, why Victoria was not placed either in general population or in Cell 43. Officer Cook knew that placing Victoria in an isolation cell in female isolation by herself violated the Sheriff's suicide prevention policy.

91.     Someone responded to her question about moving Victoria to comply with the policy. Officer Cook does not remember who specifically responded. That person said that Lieutenant Recktenwald had ordered Victoria to be placed in an isolation cell by herself because Victoria was being mouthy. Thus, Victoria stayed in isolation by herself.

92.     Jail staff should have observed Victoria at least once every fifteen minutes. Instead, often times they only saw her every thirty minutes, and actually sometimes only every forty-five minutes. This violates the Jail's procedure.

93.     On August 24, 2016 at 9:30 am, Officer Boger made a "round" in the female isolation unit where he claims he observed Victoria sitting on her bed.

94.     About forty minutes after the "9:30 round," Officer Boger made another "round" and at 10:09 or 10:10 am. He claims that he observed Victoria standing by her cell door. He actually just walked past her cell at first, and then as he was opening the door at the end of the hallway past her cell to leave the isolation unit, he appears to have looked back at her cell. At that time, he noticed that, instead of standing, Victoria was hanging by a bed sheet attached to her neck from the cell door.

95.     Once he discovered Victoria hanging, Officer Boger called for assistance. He grabbed her from behind and held her, but he did not untie or remove the bedsheet from her neck until others arrived later. She was alive at that time.

96.     Once other staff arrived, they cut the bedsheet and placed Victoria on the ground. Sheriff Stokes' employees and agents, including LPN Bailey, began taking turns performing chest compressions and CPR on Victoria. They performed chest compressions and CPR on Victoria until EMS arrived.

97.     Eventually, EMS arrived and took over the life support for Victoria. EMS rushed Victoria to Wake Forest Baptist Medical Center by ambulance.

98.     Victoria was admitted to the ICU at Baptist Medical Center, but never regained consciousness.

99.     After Victoria was admitted to Baptist Medical Center, and as soon as he was notified, Charles immediately traveled to the hospital and tried to see her. He was barred from seeing her for three days because there was a court order preventing it. Eventually, Charles got his visitation rights approved, and spent almost all of his time at the hospital with Victoria, by her side, until she died.

32

100. On September 7, 2016, about two weeks after Victoria was admitted, she died.

101. Sheriff Stokes' employee who conducted the internal investigation, Detective Kimel, found that no violations of policy occurred. The official North Carolina Department of Health and Human Services Division of Heath Service Regulation (DHSR) investigation later refuted Det. Kimel's self-serving conclusion.

102. Det. Kimel also wrote conflicting statements in his report. In his handwritten notes of his interview with DO Boger, Det. Kimel recorded that DO Boger stated: "rounds once every 30 mins or more they do rounds." In his typed up synopsis of DO Boger's interview, Det. Kimel wrote that DO Boger "advised that they do 'rounds' at least every 30 minutes." This is a material difference meant to skew the outcome of the investigation and cover up violations of the regulations, policies, rules, and standard.

103. In his findings of his internal investigation of his employer's Jail, Det. Kimel wrote: "Upon review of Davie County Sheriff's Office Detention Center Policy (Section 4.10), there were no deviations from policy. All protocols appear to have been followed. Other than common withdrawal symptoms from narcotics and alcohol, Mrs. Short had no other current suicidal indicators which would have led officers or staff to implement any further action."

104. Det. Kimel's findings show either an utter lack of understanding of or any attempt to bother to actually review the records described above, on the one hand, or a willful attempt to cover up the choices, made by several of his colleagues, to violate the regulations, policies, rules, and safety standards, on the other. Regardless of where Det.

Kimel's attempted whitewash falls on that spectrum, it shows that the Sheriff and his employees did not take Victoria's death seriously and wanted to just go about their lives without ever taking any responsibility for her death.

105. A different Sheriff's employee, Detective Hemmings, also assisted in the internal review of Victoria's death and reviewed the isolation wing's closed circuit TV footage from August 24. He recorded the following about that footage:

    a. At 0940 hours (August 24, 2016) a male Detention Officer is walking through the isolation hallway that is in question. The written records indicate that unit 323 marked "all ok" at 0944.

    b. At 0949 I observed movement inside the cell in questioned. While reviewing video footage, the cell in question is the 3rd to last on the left from the camera. I observed what I believe to be a white sheet going through the bars.

    c. At 0951 and 0952 I could still see the white sheet flickering through the bars. I believe Victoria is tying the sheet around the bars.

    d. At 0956:12 I believe there is a flicker that is very faint and this is the last movement that I could see from her cell.

    e. At 1009 hours, Officer Boger is seen making his rounds and walks past the cell in questioned where Victoria was hanging. Boger gets to the door to walk out in the hallway and turn his head and sees Victoria. It is clear Boger immediately gets on the radio and calls for assistance. Boger is seen going into the cell after it is opened.

    f. Listening to CAD calls at 1012 hours when EMS is called.

106. Yet another Sheriff's employee, Detective Stutts, assisted in the internal review of Victoria's death and reviewed the intake forms and medical records. While Det. Stutts did not appear to have any input in Det. Kimel's erroneous findings and conclusions

34

about the Sheriff and his employees' and agents' failures to comply with his own policy, it does appear that Det. Stutts knew that Victoria should have had the benefit of proper application of the suicide prevention protocol. Det. Stutts noted in a written report that Victoria answered "yes" to at least two questions on the "Medical Staff Receiving Screening form" and that Victoria had drug addiction and withdrawal issues. Det. Stutts also bothered to actually look in the Sheriff's own records to retrieve and review the July 6 incident where she attempted to commit suicide. This information was there to be seen before Victoria attempted suicide if any of the Sheriff's agents and employees had bothered to look or pay attention when they did actually see it.

107. Det. Stutts did not appear to have any part in writing Det. Kimel's final report, likely because the information in Det. Stutts written report flies in the face of Det. Kimel's conclusions.

108. In February 2017, a newspaper reporter began asking Sheriff Hartman whether he had submitted the proper paperwork to DSHR about Victoria's death in compliance with the law. He had not.

109. When Sheriff Hartman eventually submitted information about Victoria's death at the Jail to the DHSR, about five months after the law required him to do so, it conducted an independent death investigation.

110. When the independent DHSR conducted its review, it found that Det. Kimel was wrong and Sheriff Hartman and the Jail failed to comply with 10A NCAC 14J .0601 (c) Supervision because the Jail should have observed Victoria at least four times per hour.

35

DSHR also noted that Sheriff Hartman should have reported Victoria's death within five days of September 7, 2016, but failed to do so until February 24, 2017.

111.    In response to the DHSR report of State code violations, Sheriff Hartman stated that "Effective immediately, any arrestee that comes into the Jail and during the booking process reveals they have been hospitalized for, attempted or considered suicide within the last 60 days will be placed on 4 times an hour observation until cleared by our medical department or Mobile Crisis."

112.    Basically, Sheriff Hartman's response to the DHSR report was that he would "actually start enforcing the existing policy" that all of his employees and agents should have already been applying at the Jail. There is no reason why Victoria had to die for Sheriff Stokes and Sheriff Hartman to properly apply this State code, much less Sheriff Stokes' own appropriate-if-actually-used suicide prevention policy in August 2016.

113.    Even so, it took intervention by DSHR several months after the fact when the internal investigation by his own employees merely glossed over it and falsely declared that everything was done the right way. If it had not been for an investigative reporter asking questions about why Victoria died an unnecessary death, the Sheriff Hartman would never have even reported this to DSHR. And only after DSHR conducted an independent review did Sheriff Hartman finally acknowledge that the Sheriff Department employees and agents violated the safety policy and code that led directly to Victoria's death. Sheriff Hartman's responses to DSHR show that he and his employees and agents are still trying to make excuses to minimize what they did. They should not be allowed to get away with that.

114.     Sheriff Stokes and, later, Sheriff Hartman's policy spells it out and states what should have happened in a simple manner. Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates, cites the North Carolina State Standards (.2403, .2801, and .3201). It states that "All detention officers will learn the signs of a suicidal inmate and respond to their needs. Inmates will be screened, classified, and supervised in order to reduce the possibility of suicides in the Detention Center." It is unquestionable that the Sheriff's agents and employees either did not know about the policy or, if they did, simply failed to apply it.

115.     The policy goes on to list possible indications that a detainee may be suicidal in section 4.10-C, seven of which are applicable here:

    1.    Actual threats to commit suicide or active discussion of suicidal intent.

    2.    Previous attempts to commit suicide.

    3.    Depression, which might be revealed by crying, withdrawal, insomnia, variations in mood, and lethargy…

    5.    Signs of serious mental health problems such as paranoid delusions or hallucinations.

    6.    Drug or alcohol intoxication or withdrawal.

    7.    History of mental illness.

    8.    Severe aggressiveness and difficulty relating to others.

116.     Victoria qualified under at least # 1, 2, 3, 6, and 7 in this list. If the Sheriff's agents and employees had done a better job of documenting her situation and symptoms, the other two most likely would have also applied. Only one of these factors needed to be present for Victoria to be placed on suicide watch and treated in a way that would have

37

prevented her completely-preventable suicide. The fact that the Sheriff's agents and employees ignored at least 5 of these individual risks is worse than if there had only been 1 risk present, but that would have been wrong, too.

117. Section 4.10-D also describes how "Detention Center medical personnel and detention officers" must "observe inmates closely for signs of potentially suicidal behavior during the following high-risk periods: 1. First 24 hours of confinement;…5. Before anticipated release…6. During poor physical health…7. During intoxication or withdrawal."

118. A review of the facts described above shows that Victoria 1) had just arrived at Jail; 2) had serious medical issues to include active withdrawal symptoms; and 3) was going to be released within a day at the end of the 48-hour hold. She was at risk for all of these reasons and the policy dictated that the Sheriff's employees and agents should have recognized that fact. They failed.

119. Section 4.10-E describes the process for dealing with at-risk detainees and what should have happened once the Sheriff's employees and agents identified Victoria was a suicide risk:

1. Place in a populated cell (depending on the severity) never place a risk inmate in a single cell

2. Depending on the severity, the nurse will be notified (if it is just a possible risk, the nurse will be notified during daytime hours)

3. Begin 10-15 minute checks and log them

38

4.   If an inmate has attempted suicide bring them up to the front, watch them continuously and call the nurse immediately who will contact Daymark Human Services.

Indeed, Section 4.10-G states in all bold and underlined: "**It is important to begin 10-15 minute checks on a suicidal inmate, even if he or she is in a multi-occupant cell. This must be documented**." The Sheriff's employees and agents did not do this.

120.   Not only did they fail to conduct appropriate watches for a patient who is at risk for suicide, they failed to do proper supervision of Victoria as a patient who was actually supposed to be on withdrawal watch. If they had merely conducted appropriate at-least-every-15-minute checks on her, Victoria would not have been able to do what she was permitted to do. Instead, someone inexplicably crossed out the "15" on the form and wrote in "30" minutes. That is egregious tampering with a form in direct contravention to the bold-faced underlined instructions in the Policy.

121.   To the extent LPN Barnes gave verbal permission to release Victoria from the original withdrawal watch around midnight of August 24, that was entirely inappropriate. First, there is no written order, so that is a violation of policy by itself. Second, there is likely no way that a patient can be taken off of a withdrawal protocol by an LPN. This is a serious medical decision, not something for an LPN. This type of serious medical decision should never occur without any input from a doctor. Upon information and belief, both the Jail policy and SHP policy require a physician to make such an order, not an LPN.

122.   Even if an LPN could make such an order, there was no reason why it should have been made. According to the indications from the entry on the Flow Chart for

39

Alcohol/Drug Withdrawal form that LPN Bailey made about 8 hours later, Victoria was still suffering from severe withdrawal symptoms that would have graded higher than a 21 on the CIWA form, if they had bothered to use it. When LPN Bailey saw Victoria 8 hours later at 8:30 am on August 24, she recorded the same level of withdrawal symptoms that LPN Barnes had noted around midnight of August 23. So these symptoms had persisted without abatement for 32 hours by that point. Victoria was a patient actively suffering from a severe withdrawal syndrome. That is not a patient who should be taken off of a withdrawal watch. Upon information and belief, both the Jail policy and SHP policy instruct Jail staff that such a patient should be taken to a hospital, not removed from withdrawal watch.

123.   Section 4.10-F states that "If an inmate is a high risk, OR HAS ATTEMPTED SUICIDE, remove all articles that the inmate has that may be used to commit suicide." Even if all of these other mandatory suicide prevention measures in the policy were ignored, basically everyone knows that a potentially suicidal detainee should never be given the very means to complete the task. Giving a suicidal detainee a bedsheet is the same as giving her a razor blade or a loaded gun. Sadly, that is exactly what the Sheriff's employees and agents gave to Victoria with tragic, but not unexpected, consequences. The policy was right. Improper application led to the exact result it would have and should have prevented.

124.   Section 4.10-H requires evaluation by a mental health professional if there is a patient who has any risk of suicide. If the evaluation by this mental health professional does not lead to a recommendation of transfer or commitment, "the mental health

professional must provide a written recommendation for the detention center medical staff and detention officers that outline the appropriate care for the inmate." It goes on to note in bold and underline: "**The precautions will continue until lifted by the detention center doctor. A copy of the doctor's report must be put into the inmate's confinement record and his or her medical files**."

125.    Nothing remotely like this happened for Victoria. Instead, apparently an LPN may have made a late night call to a PA in Charlotte and neither of them recognized the glaring risks Victoria posed of suicide. Certainly, there is no record of a doctor's report in any of Victoria's medical records from the Jail. That is because it never happened.

126.    Unfortunately, in spite of an adequate Policy, nobody paid attention to the glaring warning signs and alarm bells about which the Policy specifically warned. The Sheriff's agents and employees even wrote down several items in Victoria's intake forms that should have immediately set off alarms for not just one, but several, high-risk factors for Victoria. Instead, in direct violation of the Policy, The Sheriff's employees and agents placed her in a single cell by herself in an isolation unit, did not conduct 10-15 minute observations, and gave her bedsheets.

127.    As a result, Victoria suffered a terrifying, preventable, and totally unnecessary death, as a direct result of her being in the sole custody and control of the Sheriff and at the mercy of Defendants.

128.    Defendants' actions, individually and combined, directly led to and caused Victoria's suffering and death.

41

129. Defendants' actions violated Victoria's clearly established and well-settled fundamental rights under the United States Constitution, including the following: the right to be free from cruel or unusual punishment, the right to adequate, necessary and emergency medical care while in custody, the right to due process before being deprived of her life, the right to substantive due process under the Fourteenth Amendment, and other inalienable rights retained by her as a citizen regardless of her circumstances in custody.

**CAUSES OF ACTION**

**COUNT ONE: VIOLATIONS OF FEDERAL CIVIL RIGHTS LAWS 42 U.S.C. § 1983 and 1988 BY LPN LINDA BARNES, LPN SUSAN DESIREE BAILY, AND PA MANUEL MALDONADO (in their individual capacities)**

130. The allegations in the Paragraphs above are incorporated by reference.

131. Defendants LPN Barnes, LPN Bailey, and PA Maldonado acted individually under the color of state law, customs, practices, usage, or policy at all times mentioned herein as Sheriff's agents or employees pursuant to his non-delegable duty to provide appropriate medical care to inmates and detainees at the Jail and had certain duties imposed upon them with regard to the treatment and care they provided Victoria.

132. These Defendants violated Victoria's rights under the United States Constitution, including rights secured by the Fourth, Eighth, and Fourteenth Amendments, or federal law, by intentionally, willfully, maliciously, and with conscious and deliberate indifference, failing to secure adequate and reasonable medical care for Victoria when they knew or should have known that Victoria faced a substantial risk of harm, and by further disregarding such risk by failing to take reasonable measures or even bother to apply the simple policy, which were readily available, to avoid that risk.

42

133.   These Defendants had actual or constructive knowledge that Victoria had been using drugs and alcohol, was suffering severe withdrawal, was displaying unusual and bizarre behavior consistent with severe withdrawal, had a recent suicide attempt that involved a four-day stay in a hospital, and that Victoria required serious immediate medical attention. They did not send Victoria to receive the medical attention that she needed. Not only did these Defendants fail to secure reasonable medical treatment for Victoria, they kept her or ordered that she be kept in an isolation unit by herself where she was unsupervised and effectively unmonitored at a time when she required urgent medical attention which ultimately led to her death.

134.   The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. These are rights which any reasonable medical care provider in a similar position as these Defendants should and would have known and did in fact know. In fact, Sheriff Stokes had the Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates, in effect for all of his employees and agents in August 2016. These Defendants also violated directly applicable North Carolina state laws. It is not possible, given the normal expectations of health care providers in general, much less in light of the express language in the Policy and the law, that these Defendants can claim that they were unaware of what should have happened to avoid violating Victoria's constitutionally protected rights in this situation. As a result, the defense of qualified immunity is unavailable to, and has been waived by, each of these Defendants.

43

135.    As a direct and proximate result of these Defendants' deprivations and violations of Victoria's constitutional and federally protected rights as alleged herein, Victoria was allowed to act on her preventable suicidal tendencies and died a slow, painful, terrifying, preventable, and completely unnecessary death. Consequently, Charles, on behalf of Victoria's Estate, is entitled to recover from each of these Defendants, in their individual capacities, damages in an amount in excess of $25,000.00.

136.    Furthermore, Charles, on behalf of Victoria's Estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish these Defendants for their illegal, unconstitutional, egregiously wrongful, reckless, and willful misconduct and to deter others from engaging in similar conduct in the future.

**COUNT TWO: VIOLATIONS OF FEDERAL CIVIL RIGHTS LAWS 42 U.S.C. § 1983 and 1988 BY SHERIFF ANDREW STOKES, SHERIFF J.D. HARTMAN, CAPT. SLOAN, LT. RECKTENWALD, SGT. MORGAN, and SGT. MEADOWS (in their official and individual capacities)**

137.    The allegations in the Paragraphs above are incorporated by reference.

138.    At all relevant times, Sheriff Stokes, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, and Sgt. Meadows were responsible for the formulation and execution of policies regarding the custody, care, and safekeeping of inmates and detainees at the Jail.

139.    At all relevant times, Sheriff Stokes, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, and Sgt. Meadows were responsible for the formulation and execution of policies regarding the medical care provided to inmates and detainees at the Jail.

44

140.    Upon information and belief and at all relevant times, Sheriff Stokes, Sheriff Hartman, Capt. Sloan, Sgt. Morgan, Lt. Recktenwald, and Sgt. Meadows were acting under color of state law, had in effect de facto policies, practices and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of the officers or medical care providers who worked at the Jail, as alleged above, including, *inter alia*:

a.    The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail in the proper methods or policies for evaluating suicide risk in inmates and detainees;

b.    The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail in the proper methods or policies for evaluating mental health issues in inmates and detainees;

c.    The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail in the proper methods or policies for evaluating drug withdrawal issues in inmates and detainees;

d.    The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail in the proper methods or policies for evaluating inmates and detainees with serious medical conditions;

e.    The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail in the proper methods or policies for assisting and treating suicide risk in inmates and detainees;

f.    The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail in the proper methods or policies for assisting and treating mental health issues in inmates and detainees;

g.    The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail

Case 1:18-cv-00741-LCB-JLW   Document 6   Filed 09/05/18   Page 45 of 76

in the proper methods or policies for assisting and treating drug withdrawal issues in inmates and detainees;

h.      The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail in the proper methods or policies for assisting and treating inmates and detainees with serious medical conditions;

i.      The failure to see that proper methods or policies were being employed by detention officers or medical care providers assigned to the Jail to evaluate the conditions of inmates and detainees in the Jail;

j.      The failure to see that proper methods or policies were being employed by detention officers or medical care providers assigned to the Jail to assist and treat inmates and detainees in the Jail with serious medical conditions;

k.      The failure to draft or institute proper or appropriate policies or procedures necessary to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

l.      The failure to ensure that detention officers or medical care providers assigned to the Jail were trained or familiar with proper policies or procedures necessary to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

m.      The failure to ensure that detention officers or medical care providers assigned to the Jail complied with proper policies or procedures necessary to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

n.      The failure to ensure that detention officers or medical care providers assigned to the Jail were trained or familiar with Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates;

46

o.     The failure to ensure that detention officers or medical care providers assigned to the Jail complied with Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates;

p.     The failure to ensure that detention officers or medical care providers who worked at the Jail complied with existing policies and procedures;

q.     The failure to ensure that detention officers or medical care providers who worked at the Jail complied with applicable statutes and administrative codes;

r.     The failure to ensure that detention officers or medical care providers who worked at the Jail were not assigned other duties that would interfere with the appropriate supervision, custody, or control of inmates and detainees; and

s.     Other policies, customs, and practices to be identified during the course of discovery or trial.

141.    Upon information and belief, Sheriff Stokes, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, and Sgt. Meadows had actual or constructive knowledge that the detention officers, medical care providers, supervisors, agents, or employees who worked at the Jail were, and had been prior to August 2016, engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates and detainees, such as Victoria.

142.    Upon information and belief, Sheriff Stokes, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, and Sgt. Meadows' responses to such actual or constructive knowledge, even after repeated instances of injury or death to other inmates and detainees, was so inadequate as to show deliberate indifference to or tacit authorization of the offensive practices described herein. In fact, by their conduct, these Defendants created

47

and encouraged a culture of neglect and indifference towards inmates and detainees in the Jail. Indeed, their actions after Victoria's death show that they would go to great lengths to conceal and cover up their violations in a misdirected attempt to avoid responsibility for their actions.

143. As a direct and proximate result of said policies, practices, and customs, Victoria's rights under the United States Constitution, including rights secured by the Eighth and Fourteenth Amendments, and under other federal laws were violated.

144. The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and is a right which any reasonable sheriff, officer, agent, medical care provider, or employee in the position of each of these Defendants would have known. Indeed, a remotely appropriate application of the Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates, by any of these Defendants or the people they were directly responsible for hiring, training, and supervising, would have completely prevented Victoria's attempted suicide and death while in their unilateral control. It is not possible, given the normal expectations of jailers in general, much less in light of the express language in the Policy, that these Defendants can claim that they were unaware of what should have happened to avoid violating Victoria's constitutionally protected rights in this situation. As a result, the defense of qualified immunity is unavailable to, and has been waived, by these Defendants.

145. As a direct and proximate result of the deprivation of Victoria's constitutional and federal rights as alleged herein, Victoria died a slow, painful, terrifying,

48

preventable, and totally unnecessary death while in the custody of the Jail and totally unable to fend for herself. Consequently, Charles, on behalf of Victoria's Estate, is entitled to recover from each of these Defendants, in their individual capacities and official capacities, compensatory damages in an amount in excess of $25,000.00.

146. Furthermore, Charles, on behalf of Victoria's Estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of these Defendants, in their individual capacities, to punish these defendants for their illegal, unconstitutional, egregiously wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

## COUNT THREE: VIOLATIONS OF FEDERAL CIVIL RIGHTS LAWS 42 U.S.C. § 1983 and 1988 BY SHERIFF J.D. HARTMAN, CAPT. SLOAN, LT. RECKTENWALD , SGT. MORGAN, SGT. MEADOWS, DETENTION OFFICER BOGER, and DETENTION OFFICERS JOHN AND JANE DOE (in their official and individual capacities)

147. The allegations in the Paragraphs above are incorporated by reference.

148. At all relevant times, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, Sgt. Meadows, Detention Officer Boger, and Detention Officers John and Jane Doe were responsible for the execution of policies regarding the custody, care, and safekeeping of inmates and detainees at the Jail.

149. At all relevant times, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, Sgt. Meadows, Detention Officer Boger, and Detention Officers John and Jane Doe were responsible for the execution of policies regarding the medical care provided to inmates and detainees at the Jail.

49

150.	Upon information and belief and at all relevant times Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, Sgt. Meadows, Detention Officer Boger, and Detention Officers John and Jane Doe, were acting under color of state law, and had in effect de facto policies, practices and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of the officers or medical care providers who worked at the Jail, as alleged above, including, *inter alia*:

    a.    The failure to comply with the proper methods or policies for evaluating suicide risk in inmates and detainees at the Jail;

    b.    The failure to comply with the proper methods or policies for evaluating mental health issues in inmates and detainees at the Jail;

    c.    The failure to comply with the proper methods or policies for evaluating withdrawal issues in inmates and detainees at the Jail;

    d.    The failure to comply with the proper methods or policies for evaluating serious medical conditions in inmates and detainees at the Jail;

    e.    The failure to comply with the proper methods or policies for assisting and treating suicide risk in inmates and detainees at the Jail;

    f.    The failure to comply with the proper methods or policies for assisting and treating mental health issues in inmates and detainees at the Jail;

    g.    The failure to comply with the proper methods or policies for assisting and treating withdrawal issues in inmates and detainees at the Jail;

    h.    The failure to comply with the proper methods or policies for assisting and treating serious medical conditions in inmates and detainees at the Jail with;

i.    The failure to comply with the proper methods or policies to evaluate the conditions of inmates and detainees in the Jail;

j.    The failure to comply with policies or procedures to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

k.    The failure to be familiar with policies or procedures necessary to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

l.    The failure to be familiar with Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates;

m.    The failure to comply with Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates;

n.    The failure to comply with existing policies and procedures;

o.    The failure to comply with applicable statutes and administrative codes;

p.    The failure to focus on and complete their assigned duties by complying with policies and procedures about the supervision, custody, or control of inmates and detainees; and

q.    Other negligence and failure to comply with policies, customs, and practices to be identified during the course of discovery or trial.

151.    Upon information and belief, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, Sgt. Meadows, Detention Officer Boger, and Detention Officers John and Jane Doe had actual or constructive knowledge that the detention officers, medical care providers, supervisors, agents, or employees who worked at the Jail were, and had been

51

prior to August 2016, engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates and detainees, such as Victoria.

152. Upon information and belief, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, Sgt. Meadows, Detention Officer Boger, and Detention Officers John and Jane Doe's responses to such actual or constructive knowledge, even after repeated instances of injury or death to other inmates and detainees, was so inadequate as to show deliberate indifference to or tacit authorization of the offensive practices described herein. In fact, by their conduct, these Defendants created and encouraged a culture of neglect and indifference towards inmates and detainees in the Jail. Indeed, their actions after Victoria's death show that they would go to great lengths to conceal and cover up their violations in a misguided attempt to avoid responsibility for their actions.

153. As a direct and proximate result of said policies, practices, and customs, Victoria's rights under the United States Constitution, including rights secured by the Eighth and Fourteenth Amendments, and under other federal laws were violated.

154. The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and is a right which any reasonable sheriff, officer, agent, medical care provider, or employee in the position of each of these Defendants would have known. Indeed, a remotely appropriate application of the Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates by any of these Defendants or the people they were directly responsible for hiring, training, and supervising, would have completely avoided Victoria's attempted suicide and death while

52

in their unilateral control. It is not possible, given the normal expectations of jailers in general, much less in light of the express language in the Policy, that these Defendants can claim that they were unaware of what should have happened to avoid violating Victoria's constitutionally protected rights in this situation. As a result, the defense of qualified immunity is unavailable to, and has been waived by these Defendants.

155.     As a direct and proximate result of the deprivation of Victoria's constitutional and federal rights as alleged herein, Victoria died a slow, painful, terrifying, preventable, and totally unnecessary death while in the custody of the Jail and totally unable to fend for herself.  Consequently, Charles, on behalf of Victoria's Estate, is entitled to recover from each of these Defendants, in their individual capacities and official capacities, compensatory damages in an amount in excess of $25,000.00.

156.     Furthermore, Charles, on behalf of Victoria's Estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of these Defendants, in their individual capacities, to punish these defendants for their illegal, unconstitutional, egregiously wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

### COUNT FOUR: WRONGFUL DEATH, NEGLIGENT HIRING, RETENTION, AND SUPERVISION —SOUTHERN HEALTH PARTNERS LLC

157.     The allegations in the Paragraphs above are incorporated by reference.

158.     At all relevant times, Defendant SHP held itself out as an entity providing healthcare for correctional facilities, including the services it provided at the Jail.

159.     SHP represented to Victoria and to the general public that SHP, its physicians, nurses, staff, agents, employees, and assigns possessed the requisite degree of knowledge, ability, and skill possessed by reasonably competent healthcare providers practicing under the same or similar circumstances as those involving Victoria's care.

160.     SHP owed Victoria a duty to care for and treat her using reasonable and ordinary care in accordance with the skill, training, and experience of reasonably competent medical care providers practicing under the same or similar circumstances in the same or similar communities as those involving Victoria; to exercise reasonable care and diligence in the application of its staff's knowledge and skill to Victoria's care; and for its staff to use their best judgment in the treatment and care of Victoria.

161.     SHP violated that duty of care by:

   a.     The failure to obtain an accurate and appropriate health assessment and physical examination upon her admission to the Jail on August 23, 2016;

   b.     The failure to pay attention to the health assessment and physical examination that was actually taken upon her admission to the Jail on August 23, 2016, which should have led to immediate action to deal with her suicide risk;

   c.     The failure to send Victoria to seek immediate emergency care for her mental health issues and suicide risk after conducting an assessment of her upon her admission to the Jail on August 23, 2016;

   d.     The failure to send Victoria to seek care for her mental health issues and suicide risk with a qualified medical care provider after conducting an assessment of her upon her admission to the Jail on August 23, 2016;

   e.     The failure to send Victoria to seek care for her mental health issues and suicide risk with a doctor, or even a physician's

54

assistant, after conducting an assessment of her upon her admission to the Jail on August 23, 2016;

f.      The failure to know how to use the Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates with Victoria when conducting an assessment of her upon her admission to the Jail on August 23, 2016;

g.      The failure to train its employees and agents about how they should use the Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates for Victoria when conducting an assessment of her upon her admission to the Jail on August 23, 2016;

h.      The failure to supervise its employees and agents to ensure that they used the Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates properly with Victoria when conducting an assessment of her upon her admission to the Jail on August 23, 2016;

i.      The failure to properly use or apply the Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates with Victoria when conducting an assessment of her upon her admission to the Jail on August 23, 2016;

j.      The failure to develop and execute a proper plan for Victoria's medical and physical requirements while she was in the Jail from August 23-24;

k.      The failure to provide appropriate withdrawal treatment to Victoria while she was in the Jail from August 23-24;

l.      The failure to provide appropriate monitoring for Victoria, who was a known suicide risk, while she was in the Jail from August 23-24;

m.     The failure to provide care by qualified and licensed individuals, practicing within the boundaries of their licensing and training;

n.     The failure to ensure that its nurses, healthcare providers, and other staff were properly qualified and trained to be able to

55

recognize the signs and symptoms of withdrawal and suicidal risks;

o.  The failure to ensure that accurate information was entered into the medical records and disseminated to ensure proper coordination and function of the SHP providers;

p.  The failure to ensure that its LPNs properly interviewed, evaluated, examined, and otherwise assessed Victoria while she was in the Jail from August 23-24;

q.  The failure to ensure that its LPNs properly interviewed, evaluated, examined, and otherwise assessed Victoria at least once per shift and twice if it was a 12-hour shift, in compliance with its own Flow Chart while she was in the Jail from August 23-24;

r.  The failure to ensure that only a doctor, and not an LPN, properly evaluated, examined, and otherwise assessed Victoria while she was in the Jail from August 23-24 and provided any orders that would remove her from withdrawal protocol;

s.  The failure to ensure that its LPNs properly interviewed, evaluated, examined, and otherwise assessed Victoria while she was in the Jail from August 23-24

t.  The failure to ensure that its physicians properly interviewed, evaluated, examined, and otherwise assessed Victoria while she was in the Jail from August 23-24;

u.  The failure to provide appropriate physician supervision to nurses, healthcare providers, an d other staff who provided medical care to Victoria;

v.  The failure to ensure that its physicians assistants properly interviewed, evaluated, examined, and otherwise assessed Victoria;

w.  The failure to provide appropriate physician assistant supervision to nurses, healthcare providers, and other staff who provided medical care to Victoria; and

x.  Other negligence as might be determined through discovery and trial in this matter.

56

162.   SHP's failures and violations of the standard of care were negligent, grossly negligent, willful and wanton, and reckless. SHP's acts constitute a proximate cause of Victoria's injuries and death and led directly to and caused Victoria's harm as set forth more fully below. As a result of SHP's acts, Charles, on behalf of Victoria's estate, is entitled to recover compensatory and punitive damages under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. § 28A-18-2.

163.   As a direct result of SHP's failures, negligence, violations of the standard of care, gross negligence, and willful and wanton and reckless acts, Victoria died a slow, painful, terrifying, totally preventable, and unnecessary death. Consequently, Charles, on behalf of Victoria's estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00.

164.   SHP's failures, negligence, gross negligence, and violations of the standard of care were malicious, corrupt, intentional, illegal, unreasonable, needless, willful and wanton, and it acted with conscious and reckless disregard of Victoria's life and safety.

165.   Furthermore, Charles, on behalf of Victoria's estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish SHP for its illegal, egregiously wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

166.   SHP is also responsible for other Defendants who worked for it, including Defendants LPN Barnes, LPN Bailey, and PA Maldonaldo. As such, it is liable for their acts that were negligent, grossly negligent, willful and wanton, and reckless acts and omissions described above, because they were acting within the course and scope of their

employment or agency with SHP. As such, SHP is liable for the conduct of those Defendants who worked for it and such conduct is imputed to SHP through the doctrines of agency, vicarious liability, and *respondeat superior*.

## COUNT FIVE: WRONGFUL DEATH - MANUEL MALDONADO, P.A.
### (In his individual capacity)

167.    The allegations in the Paragraphs above are incorporated by reference.

168.    At all relevant times, PA Maldonado held himself out as a physician's assistant providing professional services to detainees at the Jail, and represented to Charles and to the general public that he possessed the requisite degree of knowledge, ability, and skill possessed by a reasonably competent physician's assistant practicing under the same or similar circumstances.

169.    PA Maldonado owed Victoria a duty to care for and treat her using reasonable and ordinary care in accordance with the skill, training, and experience of a reasonably competent physician's assistant practicing under the same or similar circumstances in the same or similar communities as those involving Victoria; to exercise reasonable care and diligence in the application of his knowledge and skill to Victoria's care; and to use his best judgment in the treatment and care of Victoria.

170.    PA Maldonado violated that duty by:

  a.  The failure to timely obtain and review an accurate determination of Victoria's medication regimen upon her admission to the Jail on August 23, 2016;

  b.  The failure to timely obtain and review an accurate and appropriate health assessment and institute an appropriate mental health plan upon Victoria's admission to the Jail on August 23, 2016;

58

c.      The failure to timely develop and execute an appropriate plan for Victoria's medical requirements;

d.      The failure to provide appropriate monitoring for Victoria related to her known risks for suicide;

e.      The failure to sufficiently monitor Victoria during her incarceration in the custody of the Sheriff at the Jail to determine and protect her safety and well-being;

f.      The failure to use care and caution in safekeeping Victoria while she was incarcerated in the custody of the Sheriff at the Jail;

g.      The failure to actually assess Victoria in person or ever actually see Victoria prior to her death;

h.      The failure to listen to or try to understand what Victoria was actually telling him and other staff members—repeatedly— about her previous suicide attempt;

i.      The failure to listen to or understand what Victoria was actually telling him and other staff members—repeatedly—about her risk of suicide;

j.      The failure to pay attention to what Victoria was reporting to him and other staff members—repeatedly—and merely prescribing medicine per a formula without having any proper appreciation of her situation and risk of suicide;

k.      The failure to properly train or supervise agents, employees, nurses, other medical care providers, and officers under his command or supervision in the proper methods for identifying inmates and detainees in need of serious medical attention;

l.      The failure to draft or institute proper polices or procedures necessary to see that inmates and detainees are provided appropriate medical care and protection from emergency and perilous medical conditions;

m.      If such policies or procedures existed, the failure to follow the same in providing for the appropriate medical care, protection, and care necessary to ensure Victoria's safety and well-being;

n.     The failure to comply with the Davie County Detention Center Health Services Policy for suicidal inmates, Section 4.10-Suicidal Inmates to ensure that Victoria received appropriate medical care and protection from her suicide risk;

o.     The failure to communicate properly with officers, nurses, doctors, and other medical care providers who worked at the Jail about Victoria's health condition;

p.     The failure to comply with statutes, regulations, and administrative code provisions regarding appropriate medical treatment of inmates and detainees;

q.     Knowingly, deliberately, and consciously denying appropriate medical care, treatment, monitoring, and supervision to Victoria;

r.     Conducting himself in an egregious and arbitrary manner by ignoring the glaring risk of suicide that Victoria posed based on what he was told by LPN Barnes, that he would have seen if he had bothered to look himself, and in taking no action to treat her appropriately but later signing off on paperwork five days after she died without any explanation; and

s.     Other negligence as might be determined through discovery and trial in this matter.

171.   PA Maldonado's failures and violations of the standard of care were negligent, grossly negligent, willful and wanton, and reckless. PA Maldonado's acts constitute a proximate cause of Victoria's injuries and death and led directly to and caused Victoria's harm as set forth more fully below. As a result of PA Maldonado's acts, Charles, on behalf of Victoria's estate, is entitled to recover compensatory and punitive damages under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. § 28A-18-2.

172.   PA Maldonado's failures and violations of the standard of care were malicious, corrupt, intentional, illegal, unreasonable, needless, willful and wanton, and he acted with conscious and reckless disregard to Victoria's life and safety. Based on PA

60

Maldonado's conduct, he is not entitled to immunity from personal liability and may be sued in his individual capacity.

173.    As a direct result of PA Maldonado's failures and violations of the standard of care, Victoria died a slow, painful, terrifying, totally preventable, and unnecessary death. Consequently, Charles, on behalf of Victoria's estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00.

174.    Furthermore, Charles, on behalf of Victoria's estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish PA Maldonado for his  illegal, egregiously wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

## COUNT SIX: WRONGFUL DEATH – LINDA BARNES, LPN
### (In her individual capacity)

175.    The allegations in the Paragraphs above are incorporated by reference.

176.    At all material times, Defendant LPN Barnes held herself out as an LPN providing medical services to detainees at the Jail under the purported supervision of PA Maldonado, and represented to Victoria and to the general public that she possessed the requisite degree of knowledge, ability, and skill possessed by a reasonably competent LPN practicing under the same or similar circumstances as those involving Victoria.

177.    LPN Barnes owed Victoria a duty to care for and treat her using reasonable and ordinary care in accordance with the skill, training, and experience of a reasonably competent LPN practicing under the same or similar circumstances in the same or similar communities as those involving Victoria; to exercise reasonable care and diligence in the

61

application of her knowledge and skill to Victoria's care; and to use her best judgment in the treatment and care of Victoria.

178. LPN Barnes violated that duty by:

    a.    The failure to timely obtain and review an accurate determination of Victoria's medication regimen upon her admission to the Jail on August 22, 2016;

    b.    The failure to timely obtain and review an accurate and appropriate health assessment and institute an appropriate medication regimen upon Victoria's admission to the Jail on August 22, 2016;

    c.    The failure to timely develop and execute an appropriate plan for Victoria's psychiatric and medical requirements;

    d.    The failure to provide appropriate monitoring for Victoria, who was at elevated risk for suicide;

    e.    The failure to timely provide clinically appropriate interviews, evaluations, examinations, and other assessments relevant to Victoria's medical condition;

    f.    The failure to sufficiently monitor Victoria during her incarceration in the custody of the Sheriff so as to determine Victoria's safety and well-being;

    g.    The failure to use care and caution in safekeeping Victoria's while she was incarcerated in the custody of the Sheriff;

    h.    The failure to listen to what Victoria was actually telling her and other staff members—about her previous suicide attempt;

    i.    The failure to properly train or supervise agents, employees, nurses, other medical care providers, and officers under her command or supervision in the proper methods for identifying inmates and detainees in need of serious medical attention;

    j.    The failure to draft or institute proper polices or procedures necessary to see that inmates and detainees are provided appropriate medical care and protection from emergency and perilous medical conditions;

k.     If such policies or procedures exist, the failure to follow the same in providing for the appropriate medical care, protection, and care necessary to ensure Victoria's well-being;

l.     The failure to timely recognize and promptly respond to the overt deterioration of Victoria's health that led to her death;

m.    The failure to communicate properly with officers, nurses, doctors, and other medical care providers who worked at the Jail about Victoria's health condition;

n.     The failure to comply with statutes, regulations, and administrative code provisions regarding appropriate medical treatment of inmates and detainees;

o.     Knowingly, deliberately, and consciously denying appropriate medical care, treatment, monitoring, and supervision to Victoria;

p.     Conducting herself in an egregious and arbitrary manner; and

q.     Other negligence as might be determined through discovery and trial in this matter.

179.   LPN Barnes' failures and violations of the standard of care were negligent, grossly negligent, willful and wanton, and reckless. LPN Barnes' acts constitute the proximate cause of Victoria's injuries and death and led directly to and caused Victoria's harm as set forth more fully below. As a result of LPN Barnes' acts, Charles, on behalf of Victoria's estate, is entitled to recover compensatory and punitive damages under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. § 28A-18-2.

180.   LPN Barnes' failures and violations of the standard of care were malicious, corrupt, intentional, illegal, unreasonable, needless, willful and wanton, and she acted with conscious and reckless disregard to Victoria's life and safety. Based on LPN Barnes'

conduct, she is not entitled to immunity from personal liability and may be sued in her individual capacity.

181.    As a direct result of LPN Barnes failures and violations of the standard of care, Victoria died a slow, painful, terrifying, totally preventable, and unnecessary death. Consequently, Charles, on behalf of Victoria's estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00.

182.    Furthermore, Charles, on behalf of Victoria's estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish LPN Barnes for her illegal, egregiously wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

## COUNT SEVEN: WRONGFUL DEATH – SUSAN DESIREE BAILEY, LPN
### (In her individual capacity)

183.    The allegations in the Paragraphs above are incorporated by reference.

184.    At all material times, Defendant LPN Bailey held herself out as an LPN providing medical services to detainees at the Jail under the purported supervision of PA Maldonado, and represented to Victoria and to the general public that she possessed the requisite degree of knowledge, ability, and skill possessed by a reasonably competent LPN practicing under the same or similar circumstances as those involving Victoria.

185.    LPN Bailey owed Victoria a duty to care for and treat her using reasonable and ordinary care in accordance with the skill, training, and experience of a reasonably competent LPN practicing under the same or similar circumstances in the same or similar communities as those involving Victoria; to exercise reasonable care and diligence in the

64

application of her knowledge and skill to Victoria's care; and to use her best judgment in the treatment and care of Victoria.

186.　LPN Bailey violated that duty by:

　　a.　The failure to timely develop and execute an appropriate plan for Victoria's psychiatric and medical requirements;

　　b.　The failure to provide appropriate monitoring for Victoria, who was at elevated risk for suicide;

　　c.　The failure to timely provide clinically appropriate interviews, evaluations, examinations, and other assessments relevant to Victoria's medical condition;

　　d.　The failure to sufficiently monitor Victoria during her incarceration in the custody of the Sheriff so as to determine Victoria's safety and well-being;

　　e.　The failure to use care and caution in safekeeping Victoria's while she was incarcerated in the custody of the Sheriff;

　　f.　The failure to listen to what Victoria was actually telling her and other staff members—about her previous suicide attempt;

　　g.　The failure to properly train or supervise agents, employees, nurses, other medical care providers, and officers under her command or supervision in the proper methods for identifying inmates and detainees in need of serious medical attention;

　　h.　The failure to draft or institute proper polices or procedures necessary to see that inmates and detainees are provided appropriate medical care and protection from emergency and perilous medical conditions;

　　i.　If such policies or procedures exist, the failure to follow the same in providing for the appropriate medical care, protection, and care necessary to ensure Victoria's well-being;

　　j.　The failure to timely recognize and promptly respond to the overt deterioration of Victoria's health that led to her death;

     k.     The failure to communicate properly with officers, nurses, doctors, and other medical care providers who worked at the Jail about Victoria's health condition;

     l.     The failure to comply with statutes, regulations, and administrative code provisions regarding appropriate medical treatment of inmates and detainees;

     m.     Other negligence as might be determined through discovery and trial in this matter.

187.    LPN Bailey's failures and violations of the standard of care were negligent, grossly negligent, willful and wanton, and reckless. LPN Bailey's acts constitute the proximate cause of Victoria's injuries and death and led directly to and caused Victoria's harm as set forth more fully below. As a result of LPN Bailey's acts, Charles, on behalf of Victoria's estate, is entitled to recover compensatory and punitive damages under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. § 28A-18-2.

188.    LPN Bailey's failures and violations of the standard of care were intentional, illegal, unreasonable, needless, willful and wanton, and she acted with reckless disregard to Victoria's life and safety. Based on LPN Bailey's conduct, she is not entitled to immunity from personal liability and may be sued in her individual capacity.

189.    As a direct result of LPN Bailey's failures and violations of the standard of care, Victoria died a slow, painful, terrifying, totally preventable, and unnecessary death. Consequently, Charles, on behalf of Victoria's estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00.

190.    Furthermore, Charles, on behalf of Victoria's estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish LPN Bailey's

for her illegal, reckless and willful misconduct and to deter others from engaging in similar

conduct in the future.

## COUNT EIGHT: WRONGFUL DEATH – SHERIFF STOKES, SHERIFF HARTMAN, CAPT. SLOAN, LT. RECKTENWALD, SGT. MORGAN, AND SGT. MEADOWS
### (In their individual and official capacities)

191.    The allegations in the Paragraphs above are incorporated by reference.

192.    Sheriff Stokes, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan,

and Sgt. Meadows owed the following duties to Victoria:

      a.    To see that detention officers, nurses, other medical care providers, agents, and employees assigned to work at the Jail performed their duties in such a way as to avoid placing Victoria in danger of injury or death;

      b.    To see that detention officers, nurses, other medical care providers, agents, and employees assigned to work at the Jail would be present and available to provide continuous supervision of Victoria so that her custody would be secure and he would be protected;

      c.    To see that detention officers, nurses, other medical care providers, agents, and employees assigned to work at the Jail would supervise Victoria sufficiently to maintain safe custody and control of Victoria;

      d.    At all times to be informed of Victoria's general health and any emergency or dangerous medical issues; and

      e.    To see that routine and emergency medical care would be provided in the event that Victoria needed any such medical care while he was incarcerated in the custody of the Sheriff at the Jail.

193.    Sheriff Stokes, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan,

and Sgt. Meadows breached these duties, including but not limited to, *inter alia*:

      a.    The failure to adequately train, supervise, instruct, or monitor officers or medical care providers assigned to the Jail in the proper method for evaluating inmates and detainees;

67

b. The failure to adequately train, supervise, instruct, or monitor officers or medical care providers assigned to the Jail in the proper method for identifying inmates and detainees in need of serious medical attention;

c. The failure to adequately train, supervise, instruct, or monitor officers or medical care providers assigned to the Jail in the proper methods for assisting and treating inmates and detainees with serious medical conditions;

d. The failure to see that proper methods were being employed to evaluate the medical condition of inmates and detainees in the Jail;

e. The failure to see that proper methods were being employed to assist and treat inmates and detainees in the Jail with serious medical conditions;

f. The failure to properly supervise officers or medical care providers assigned to the Jail;

g. The failure to see that inmates and detainees at the Jail were supervised properly to maintain safe custody of such inmates and detainees;

h. The failure to see that officers and medical care providers assigned to the Jail supervised inmates and detainees sufficiently to be at all times informed of the inmates' and detainees' general health and emergency medical needs;

i. The failure to properly train or supervise agents, employees, medical care providers, and officers so that inmates and detainees, including Victoria, were provided with protection and care while incarcerated;

j. The failure to draft or institute proper policies or procedures necessary to see that inmates and detainees were provided appropriate, necessary and adequate medical care, and protection from emergency and perilous medical conditions;

k. If such policies or procedures existed, the failure to follow them in providing for the appropriate medical care, protection and care necessary to ensure Victoria's well-being;

68

l.   The failure to implement and train agents, employees, officers, nurses, and other medical care providers in proper and reasonable policies or procedures regarding the evaluation, monitoring, supervision, observation, and housing of inmates and detainees in the Jail including, and especially inmates and detainees who are displaying unusual, bizarre, and erratic behavior, have a previous record of mental illness, or have serious medical conditions;

m.   The failure to see that officers or medical care providers who worked at the Jail complied with existing policies and procedures;

n.   The failure to see that officers or medical care providers who worked at the Jail complied with applicable statutes and administrative codes;

o.   The failure to see that officers or medical care providers who worked at the Jail were not assigned other duties that would interfere with the continuous supervision, custody, or control of inmates and detainees; and

p.   In other ways to be identified during the course of discovery or trial.

194.   At the time that the other Defendants committed the negligent, grossly negligent, willful and wanton, and reckless acts and omissions described above, they were acting within the course and scope of their employment or agency with Sheriff Stokes, as the Sheriff of Davie County. As such, Sheriff Stokes is liable for the conduct of the other Defendants and such conduct is imputed to Sheriff Stokes through the doctrines of agency, vicarious liability, and *respondeat superior*.

195.   As a direct and proximate result of the negligent, grossly negligent, willful and wanton, and reckless acts and omissions described above of Sheriff Stokes, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, and Sgt. Meadows, and the other Defendants which are imputed to Sheriff Stokes, Victoria died a slow, painful, terrifying,

69

totally preventable, and unnecessary death. Consequently, Charles, on behalf of Victoria's estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00 from each of the following Defendants: Sheriff Stokes, in his individual and official capacity; Sheriff Hartman, in his individual and official capacity; Captain Sloan, in his individual and official capacity; Lt. Recktenwald in her individual and official capacity; Sgt. Morgan in her individual and official capacity; and Sgt. Meadows in her individual and official capacity.

196.    Furthermore, Charles, on behalf of Victoria's estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish Sheriff Stokes for the illegal, egregiously wrongful, reckless and willful misconduct committed by their agents and employees and to deter others from engaging in similar conduct in the future.

### COUNT NINE: VIOLATION OF N.C. GEN. STAT. § 162-55 - SHERIFF STOKES, SHERIFF HARTMAN, CAPT. SLOAN, LT. RECKTENWALD, SGT. MORGAN, SGT. MEADOWS, DETENTION OFFICER BOGER, DETENTION OFFICERS JOHN AND JANE DOE, PA MALDONADO, LPN BARNES, and LPN BAILEY (In their individual and official capacities)

197.    The allegations in the Paragraphs above are incorporated by reference.

198.    Victoria was committed to the custody and care of Sheriff Stokes, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, Sgt. Meadows, Detention Officer Boger, Detention Officers John and Jane Doe, P.A. Maldonado, LPN Barnes, and LPN Bailey, and the other detention staff and medical providers who worked at the Jail from August 22, 2016 to August 24, 2016, as alleged above.

70

199. These Defendants were all keepers of the Jail pursuant to N.C. Gen. Stat. § 162-55.

200. The conduct of these Defendants with regard to the lack of attention, negligence and gross negligence related to Victoria, as alleged above, was so careless, wanton, and reckless that it demonstrated a thoughtless disregard of consequences and a heedless indifference to her safety and rights.

201. The conduct of these Defendants, as alleged above, was a proximate cause of Victoria's death and constituted a wrong or injury to Victoria pursuant to N.C. Gen. Stat. § 162.55.

202. Sheriff Stokes, Sheriff Hartman, Capt. Sloan, Lt. Recktenwald, Sgt. Morgan, and Sgt. Meadows are liable for the conduct of the other detention staff and medical providers who worked at the Jail from August 22, 2016 to August 24, 2016, as alleged above, in their supervisory capacity. As such, all of the conduct described above is imputed to Sheriff Stokes. All of the conduct as described above, other than Sheriff Stokes', is imputed to Sheriff Hartman. All of the conduct as described above, other than Sheriff Stokes' or Sheriff Hartman's, is imputed to Capt. Sloan. All of the conduct as described above, other than Sheriff Stokes', Sheriff Hartman's, or Capt. Sloan's is imputed to Lt. Recktenwald. All of the conduct as described above, other than Sheriff Stokes', Sheriff Hartman's, Capt. Sloan's, Lt. Recktenwald's or each other's, is imputed to Sgt. Meadows and Sgt. Morgan. This occurs by way of the doctrines of agency, vicarious liability, and *respondeat superior*.

71

203.   As a direct and proximate result of the conduct of these Defendants, as alleged above, Victoria died a slow, painful, terrifying, preventable, totally unnecessary death in the Jail. Consequently, Charles, on behalf of Victoria's estate, is entitled to recover from each of these Defendants, in their individual and official capacities, compensatory damages in an amount in excess of $25,000.00 pursuant to N.C. Gen. Stat. § 162-55.

204.   Furthermore, Charles, on behalf of Victoria's estate, is entitled to recover treble damages as set out in N.C. Gen. Stat. § 162-55.

## COUNT TEN: ACTION ON BONDS and N.C. GEN. STAT. § 58-76-1, *et sequ*. – SHERIFF STOKES, SHERIFF HARTMAN, and WESTERN SURETY (in their individual and official capacities)

205.   The allegations in the Paragraphs above are incorporated by reference.

206.   As alleged herein, Sheriff Stokes neglected the duties of his office and committed wrongful acts as Sheriff and of Davie County.

207.   Victoria died as a proximate result of Sheriff Stokes' neglect and wrongful acts in office. Consequently, Charles, on behalf of Victoria's estate, is entitled to recover from Sheriff Stokes' surety, Western Surety, damages in excess of $25,000.00.

## DAMAGES

208.   The allegations in the Paragraphs above are incorporated by reference.

209.   At the time of her death, Victoria had a husband and child and an expectation of living out the rest of her life for many years. Defendants' actions deprived Victoria and her family from having an opportunity to fulfill these humble wishes and destroyed these familial bonds.

210.    As a direct and proximate result of these wrongful and negligent actions by Defendants, Victoria and her estate suffered loss and is entitled to recover from Defendants, jointly and severally, under both the North Carolina Wrongful Death Statute N.C. Gen. Stat. § 28A-18-2 and 42 U.S.C. § 1983: compensation for the totally avoidable and unnecessary pain and suffering Victoria experienced leading up to her death, from August 23–September 7, 2016; funeral expenses incurred for her burial; the value of services, protection, care and assistance of Victoria to her heirs and loved ones; and any other damages or expenses incurred by Victoria or her estate resulting from the wrongful and negligent actions by Defendants that led to her death.

211.    Charles is entitled to loss of consortium that he would have received from Victoria to include her society, companionship, comfort, guidance, kindly offices and advice. They had been married for over two years and had the hope and expectation of many years left together.

212.    Charles is also entitled to recover from Defendants, jointly and severally, treble damages pursuant to N.C. Gen. Stat. § 162-55.

213.    By reason of the grossly negligent, reckless, malicious, needless, willful and wanton conduct of Defendants, as alleged above, as well as Defendants' conscious disregard for the safety of Victoria, Charles, on behalf of Victoria's estate, is entitled to receive punitive damages under both the state and federal law in an amount to be determined at trial but in excess of $25,000.00 to punish Defendants' for their illegal, unconstitutional, unlawful, egregiously wrongful, reckless, willful and wanton misconduct and to deter such conduct by others in the future.

73

## RULE 9(J) STATEMENT FOR ALL
## MEDICAL MALPRACTICE CAUSES OF ACTION

214.    The allegations in the Paragraphs above are incorporated by reference.

215.    Charles submits that Rule 9(j) of the North Carolina Rules of Civil Procedure is unconstitutional under both the state and federal constitutions and violates, among other things, his equal protection rights, due process rights, his right to equal and open access to the courts, and the right to a jury trial as set forth in Amendments VII and XIV of the United States Constitution and Article I, Sections 1, 6, 18, 19, and 25 and Article IV, Sections 1 and 13 of the North Carolina Constitution. However, without waiving this objection and out of an abundance of caution, Charles states that medical health providers who Charles reasonably believes will qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence reviewed all of the allegations of negligence related to medical care that is described in this Complaint and all the medical records pertaining to the alleged negligence that are available to Charles after a reasonable inquiry. These experts are willing to testify that the medical care complained of did not comply with the applicable standard of care. In addition, if a Court should later determine that anyone who has reviewed the medical care complained of in this Complaint does not meet the requirements to testify under Rule 702(b) or (c) of the North Carolina Rules of Evidence, then Charles will seek to have such person(s) qualified as an expert witness by motion pursuant to Rule 702(e) of the North Carolina Rules of Evidence, and Charles moves the Court (as provided in Rule 9(j) of the North Carolina Rules of Civil Procedure) that such

person(s) be qualified as an expert witness under Rule 702(e) of the North Carolina Rules of Evidence.

### OBJECTION TO CAP ON NON-ECONOMIC DAMAGES FOR ALL MEDICAL MALPRACTICE CAUSES OF ACTION PURSUANT TO N.C. GEN. STAT. 90-21.19

216.    The allegations in the Paragraphs above are incorporated by reference.

217.    Charles objects to N.C. Gen. Stat. § 90-21.19 which purports to place a cap on non-economic damages in a medical malpractice case, because it violates both the state and federal constitutions, and violates, among other things, his equal protection rights, due process rights, his right to equal and open access to the courts, the right to a jury trial, violates the separation of powers, and confers an exclusive emolument on health care providers and the insurance companies that provide them with professional malpractice insurance as set forth in Amendments VII and XIV of the United States Constitution and Article I, Sections 1, 6, 18, 19, 25, and 32 and Article IV, Sections 1 and 13 of the North Carolina Constitution.

### PRAYER FOR RELIEF

WHEREFORE, Charles, on behalf of Victoria's estate, respectfully prays this Honorable Court that he have and recover judgment against Defendants, jointly and severally as follows:

1.    Compensatory damages in an amount in excess of twenty-five thousand dollars ($25,000);

2.    Treble damages pursuant to N.C. Gen. Stat. § 162-55;

75

3.    Punitive damages in accordance with the law in an amount to be determined by a Jury;

4.    That the costs of this action including, but not limited to, pre-judgment and post-judgment interest charged at the legal rate and attorneys' fees pursuant to 42 U.S.C. § 1988 and as otherwise allowed by law be assessed against Defendants from the time of the filing of this action until paid;

5.    For Jury trial on all issues of fact; and

6.    For any and all further relief as to the Court may seem just and proper.


This 5th day of September 2018.

/s/ W. Ellis Boyle
W. Ellis Boyle
N.C. State Bar No. 33826
*Attorney for Plaintiff*
Knott & Boyle, PLLC
4800 Six Forks Road, Suite 100
Raleigh, NC  27609
Telephone:  919-783-5900
Facsimile:  919-783-9650
Email:  ellis@knottboyle.com


/s/ E. Winslow Taylor
E. Winslow Taylor
N.C. State Bar No. 45533
*Attorney for Plaintiff*
Crumpler Freedman Parker & Witt
860 West Fifth Street
Winston-Salem, NC 27101
Telephone: 336-725-1304
Facsimile:  336-761-8845
Email: winslow@cfpwlaw.com