# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CHARLES WILLIAM SHORT, individually,   )
and as Administrator of the Estate of   )
VICTORIA CHRISTINE SHORT,   )
   )
       Plaintiff,   )
   )
     v.   )
   )
ANDREW C. STOKES, SHERIFF OF DAVIE   )
COUNTY, in his individual and official   )
capacity; J.D. HARTMAN, SHERIFF OF   )
DAVIE COUNTY, in his individual and official )
capacity; CAMERON SLOAN, CAPTAIN,   )
Chief Jailer with the Davie County Sheriff's   )
Department, in his individual and official   )
capacity; DANA RECKTENWALD,   )
LIEUTENANT, Operations Supervisor of the   )
Detention Center with the Davie County   )
Sheriff's Department, in her individual and   )       1:18CV741
official capacity; TERESA MORGAN a/k/a   )
TERESA M. GODBEY, SERGEANT, Jailer-   )
Detention Officer with the Davie County   )
Sheriff's Department, in her individual and   )
official capacity; CRYSTAL MEADOWS,   )
SERGEANT, Detention Officer with the   )
Davie County Sheriff's Department, in her   )
individual and official capacity; MATTHEW   )
TRAVIS BOGER, Jailer-Detention Officer   )
with the Davie County Sheriff's Department, )
in his individual and official capacity; JOHN )
or JANE DOES 1-5, Jailers-Detention   )
Officers with the Davie County Sheriff's   )
Department, in their individual and official   )
capacity; and WESTERN SURETY   )
COMPANY,   )
   )
       Defendants.   )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Charles Willis Short ("Mr. Short"), acting individually and as the Administrator of the Estate of Victoria Christine Short ("Mrs. Short"), filed this action against multiple defendants allegedly involved in the events at the Davie County Detention Center, which led to Mrs. Short's suicide in 2016. (Am. Compl. [Doc. #6].) This matter is before the Court on a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure filed by Defendants Sheriff Andrew C. Stokes, Sheriff J.D. Hartman, Captain Cameron Sloan, Lieutenant Dana Recktenwald, Sergeant Teresa Morgan, Sergeant Crystal Meadows, Officer Matthew Travis Boger, and Western Surety Company, (collectively, "Defendants"). (Mot. for J. on the Pleadings ("Motion") [Doc. #54].) Specifically, Defendants seek to have all remaining claims (Counts Two, Three, Eight, Nine, and Ten) dismissed. For the reasons explained below, the federal claims (Counts Two and Three) are dismissed with prejudice and the remaining state law claims (Counts Eight, Nine, and Ten) are dismissed without prejudice pursuant to 28 U.S.C. § 1367.

I.

The facts relevant to Defendants' Motion are presented in the light most favorable to Mr. Short,[1] who brings this action as the administrator of his late

---

[1] When considering Defendants' Motion under Rule 12(c), the well-pleaded facts in the Amended Complaint are accepted as true and are viewed in the light most favorable to Mr. Short. See Priority Auto Grp., Inc. v. Ford Motor Co., 757 F.3d

wife's estate. Mrs. Short attempted suicide on August 24, 2016 while being detained in the Davie County Detention Center ("Detention Center") and died as a result of her injuries on September 7, 2016. (See Am. Compl. ¶ 2.)

On July 6, 2016, approximately six weeks prior to her arrest on August 22, 2016, the Davie County Sheriff's Department responded to a call from Mr. Short because Mrs. Short attempted suicide by taking a large number of pills. Mrs. Short was hospitalized for four days following the attempted suicide. (Id. ¶¶ 33-37.)

On August 22, 2016, Deputy Moxley and Corporal Tellinger of the Davie County Sheriff's Department responded to the Shorts' home again, this time regarding a domestic dispute between Mr. and Mrs. Short. (Id. ¶ 38.) When Deputy Moxley and Corporal Tellinger arrived, Mrs. Short was "extremely upset and appeared to be on some type of narcotic as she was shaking uncontrollably, twitching from the neck area, and had needle marks all down both her arms." (Id. ¶ 39; Ex. B to Am. Compl. at 3.) At that time, Mrs. Short informed the deputies that she had used Xanax the day before, and she declined any medical attention. (Id.; Ex. B to Am. Compl. at 3.) Before Mr. and Mrs. Short were taken into custody, Mr. Short and his brother-in-law, Dwight Ross, informed the deputies that Mrs. Short "was suicidal and had recently attempted suicide." (Id. ¶¶ 40, 41.) After their first appearances before a magistrate, Mr. Short was released while

---

137, 139 (4th Cir. 2014) (citing Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)); see also Lucero v. Early, 873 F.3d 466, 469 (4th Cir. 2017).

Mrs. Short was placed on a 48-hour domestic hold at the Detention Center. (Id. ¶¶ 42-43.)

Upon arriving at the Detention Center, just after midnight on August 23, 2016, Mrs. Short underwent in-processing, including medical screening by Linda Barnes, LPN ("LPN Barnes"), a licensed practical nurse ("LPN") working for Southern Health Partners ("SHP"). (Id. ¶¶ 11, 12.) SHP had a contract with Davie County to provide medical treatment to detainees at the Detention Center. (Id. ¶ 11.) According to the Amended Complaint, LPN Barnes, Susan Bailey, LPN ("LPN Bailey"), and Manuel Maldonado, PA ("PA Maldonado") "provided medical care to inmates and detainees held in Sheriff Stokes custody at the Jail" and were employees and agents of SHP, Sheriff Stokes and Sheriff Hartman.[2] (Id. ¶¶ 12-14.)

LPN Barnes started Mrs. Short's medical screening at 12:09 a.m. on August 23 on a Medical Staff Receiving Screening form. (Id. ¶ 45.) During an internal investigation conducted following Mrs. Short's death, LPN Barnes told another individual, Sergeant Kimel, that at this point in the intake, Mrs. Short "was doubled over in pain while sitting in the chair due to abdominal pains." (Id. ¶ 60.) However, LPN Barnes did not report or record that information anywhere or to anyone else on August 23. (Id.) Nevertheless, LPN Barnes noted on Mrs. Short's

---

[2] LPN Barnes, LPN Bailey, and PA Maldonado were named as defendants in this case and have since entered into stipulations of dismissal with Plaintiff. (Stipulation of Dismissal of LPN Linda Barnes, LPN Susan Desiree Bailey, and P.A. Manuel Maldonado by Charles William Short [Doc. #77].)

4

initial medical evaluation forms that she was exhibiting "severe" signs of withdrawal. (Id. ¶¶ 46-49.) LPN Barnes reported on the screening form that Mrs. Short was suffering from nausea, vomiting, and diarrhea and should be placed on alcohol and drug withdrawal monitoring. (Id. ¶ 46.)

On the same form completed during in-processing, LPN Barnes marked "[n]o" to the question of whether Mrs. Short "show[ed] signs of illness, injury . . . or other symptoms suggesting the need for immediate emergency medical referral." (Id. ¶ 46.) LPN Barnes handwrote, however, that Mrs. Short had "scabs/sores on face, arms, legs, trunk"; had visible signs of being under the influence of, or withdrawing from, "drugs"; had considered or attempted suicide a "month ago"; and had been hospitalized for a suicide attempt in "July 2016." (Id.) LPN Barnes also documented that Mrs. Short used "heroin, Xanax, opana," and "alcohol" "daily." (Id.; Ex. C to Am. Compl. at 2.) Of note, LPN Barnes did not fill in the section of the form which asked if the detainee "exhibited any signs that suggest the risk of suicide, assault or abnormal behavior." (Id.) She did write that Mrs. Short should be placed on "ETOH/Benzo/Opiate detox protocol and [withdrawal] monitoring." (Ex. C to Am. Compl. at 2; see also Ex. E to Am. Compl. at 2.)

LPN Barnes also completed a second assessment at 12:09 a.m. that evaluated Mrs. Short's withdrawal severity. (See Am. Compl. ¶ 47; Ex. D to Am. Compl. at 2.) The form provided a scale of zero to seven for withdrawal symptoms in nine categories, with "zero" representing the least severe symptoms and "seven" representing the most severe symptoms, and zero to four in a tenth

category, measuring "Orientation and Clouding of Sensorium." (Ex. D to Am. Compl. at 2.)  According to LPN Barnes, Mrs. Short was exhibiting the following withdrawal symptoms on the scale of zero to seven: 1) intermittent nausea with dry heaves (score: 5); 2) moderate tremors (score: 5); 3) paroxysmal sweats (score: 3); 4) high anxiety (score: 6); 5) moderately fidgety and restless (score: 4); 6) moderately severe hallucinations (score: 4); 7) moderate harshness or ability to frighten (score: 3); 8) moderate sensitivity (score: 3); and 9) headache (score: 0); and in the tenth category, she noted Mrs. Short registered an inability to do serial additions or was uncertain about the date (score: 1). (Id.; Am. Compl. ¶¶ 47, 49.) The form states that "[p]atients scoring less than 10 do not usually need additional medication for withdrawal." (Ex. D. to Am. Compl. at 2.)  Mrs. Short scored thirty-four points out of a maximum possible score of sixty-seven. (Id.)  Mr. Short alleges that based on the Physicians Order LPN Barnes completed, (see Ex. E to Am. Compl.), "the Jail and medical providers knew that [Mrs. Short] suffered from a complex withdrawal situation involving several different types of drugs." (Am. Compl. ¶ 59.)  LPN Barnes additionally authorized that Mrs. Short could be moved to female isolation, purportedly due to having "open draining sores all over her body." (Id. ¶ 73.)  Mrs. Short was placed in a cell by herself with no one else on the hallway, (id. ¶ 69), and was provided a bedsheet in violation of the Detention Center's policy, (id. ¶ 123).

At some point on August 23—following LPN Barnes' assessments—Sergeant Morgan completed a "Medical Questionnaire" form, evaluating Mrs. Short's mental

health. (Id. ¶ 62.)  Sergeant Morgan noted that Mrs. Short had "considered or attempted suicide" "last month," that Mrs. Short used drugs and alcohol (presumably quoting Mrs. Short as saying "whatever can get my hands on"), had visible signs of skin lesions, and appeared to be under the influence of or withdrawing from drugs. (Ex. G to Am. Compl. at 2-3.)  Sergeant Morgan failed to complete the sections of the form asking whether Mrs. Short had been treated for mental health problems, had been hospitalized within the last year, was unconscious or showing visible signs requiring immediate emergency medical attention, or was exhibiting signs of a risk of suicide. (Id.)

At around 1:30 a.m., Sergeant Morgan completed a second form pertaining to Mrs. Short's mental health and suicide risk. (Id. ¶ 63; Ex. H to Am. Compl. at 2.)  This form included referral instructions, requiring that "[t]his detainee should be referred for further mental health evaluation if he/she answered: 'yes' to ever being hospitalized for emotional or mental health problems, 'yes' to at least two of the first six questions, or for any other reason deemed necessary." (Id. ¶ 64; Ex. H to Am. Compl. at 2.)  While Mrs. Short's form indicated "no" to being hospitalized for emotional or mental health problems, either Mrs. Short or Sergeant Morgan wrote in, "When I tried to com. suicide stayed in hospital 4 days." (Id. ¶ 65; Ex. H to Am. Compl. at 2.)  Regarding the first six questions on the form, Mrs. Short answered "yes" to question 5 ("Do you currently feel like you have to talk or move more slowly than you usually do?") and question 6 ("Have there currently been a few weeks where you felt like you were useless or sinful?"). (Id. ¶ 63; Ex. H to

7

Am. Compl. at 2.)  Mr. Short alleges that based on the responses, "S[ergeant] Morgan should have referred [Mrs. Short] for further mental health evaluation." (Id.)  However, Sergeant Morgan neither referred Mrs. Short for further mental health evaluation nor marked "NOT REFERRED," which was another option provided on the form. (Id. ¶ 66; Ex. H to Am. Compl. at 2).  Sergeant Morgan also did not mark where indicated that Mrs. Short was "under the influence of drugs/alcohol." (Id. ¶ 67; Ex. H to Am. Compl. at 2).  Mr. Short alleges that "S[ergeant] Morgan either chose to not pay attention to this safety measure when she should have been doing her job, or even worse, she paid attention, but simply did not care and chose to ignore the simple instructions." (Id.)  Mr. Short further contends that "[e]ither way, S[ergeant] Morgan's choice led to Victoria's death." (Id.)

According to the Amended Complaint, LPN Barnes ordered Mrs. Short to be placed on withdrawal protocol at or around 12:09 a.m. when she filled out the first forms at intake. (Id. ¶¶ 46, 71.)  Withdrawal protocol was to include a medical evaluation at least three times per day, but Mrs. Short was evaluated only twice in a 32-hour period.  (Id. ¶¶ 71, 75.)  Mr. Short alleges that even though Mrs. Short's symptoms persisted "for at least 32 hours, the SHP medical staff and Jail employees did nothing." (Id. ¶ 80; Ex. J to Am. Compl.)

On August 24, 2016 at 8:30 a.m., LPN Bailey—who took over LPN Barnes's shift sometime between midnight of August 23 and 8:00 a.m. of August 24—noted that Mrs. Short was still exhibiting the same "overt and dangerous signs of

withdrawal:" weakness, restlessness, sweating, shakiness/muscle twitching, anxiety, vomiting, nausea, slurred speech, and complaints of being cold. (Id. ¶¶ 74, 79, 81.)  Yet, she did not make any changes to Mrs. Short's treatment and did not notify any other medical personnel. (Id. ¶¶ 80, 81.)

Mr. Short alleges that "the Jail staff should have observed [Mrs. Short] at least once every fifteen minutes"; however, "often times they only saw her every thirty minutes, and . . . sometimes only every forty-five minutes" in violation of the detention policy. (Id. ¶ 92.)  He contends that, also in violation of the Detention Center's policy, the staff "took [Mrs. Short] off of withdrawal monitoring without any doctor's order to so do." (Id. ¶ 72.)

Officer Sarah Cook, a detention officer working at the Detention Center, arrived for her shift at 6:45 a.m. on August 24, 2016 and learned of Mrs. Short's previous suicide attempt from another officer working at the jail. (Id. ¶¶ 84-86.) Officer Cook observed that Mrs. Short was being housed in a cell by herself and asked Sergeant Meadows why she was not with the general population given her previous suicide attempt. (Id. ¶ 90.)  Someone informed Officer Cook that Lieutenant Recktenwald had ordered Mrs. Short to be placed in isolation "because [she] was being mouthy." (Id. ¶ 91.)

At 9:30 a.m. on August 24, 2016, Officer Boger "made a 'round' in the female isolation unit," where he "claims he observed [Mrs. Short] sitting on her bed." (Id. ¶ 93.)  This was followed by another round at 10:09 a.m. or 10:10 a.m., during which Officer Boger "observed [Mrs. Short] standing by her cell door."

9

(Id. ¶ 94.)  As Officer Boger was leaving the isolation unit though, "he appears to have looked back at her cell," noticing "instead of standing, [Mrs. Short] was hanging by a bed sheet attached to her neck from the cell door." (Id.)  After requesting assistance, Officer Boger "grabbed her from behind and held her," and when assistance arrived, resuscitation was performed on Mrs. Short until Emergency Medical Services arrived and took her to the hospital. (Id. ¶¶ 95-96.) Mrs. Short never regained consciousness and died on September 7, 2016. (Id. ¶ 100.)

   Throughout the Amended Complaint, Mr. Short alleges that despite established policies for handling detainees who are suicidal and/or undergoing drug withdrawal, Sheriff Stokes' employees and agents failed to follow the Detention Center's polices, which resulted in Mrs. Short's death. (See, e.g., id. ¶¶ 25, 68.) The Detention Center's policy Section 4.10-C, for example, lists nine indicators of potentially suicidal behaviors,[3] and Mr. Short asserts that despite only needing to present with one of these risk factors in order to be identified as a suicide risk, Mrs. Short was exhibiting "at least five" of those indicators, which "the Sheriff's agents and employees ignored." (Id. ¶ 116.)

---

[3] Those nine factors include: "1) Actual threats to commit suicide or active discussion of suicidal intent[,] 2) Previous attempts to commit suicide[,] 3) Depression . . . [,] 4) Giving away all personnel property[,] 5) Signs of serious mental health problems such as paranoid delusions or hallucinations[,] 6) Drug or alcohol intoxication or withdrawal[,] 7) History of mental illness[,] 8) Severe aggressiveness and difficulty relating to others[,] [and] 9) Speaking unrealistically about the future or about getting out of detention when it is obvious there is no legal way out[.]" (Id. ¶ 115; Ex. I to Am. Compl.)

10

The policy further requires the observation of "inmates closely for signs of potentially suicidal behavior during the following high-risk periods," which include during the "[f]irst 24 hours of confinement," [b]efore anticipated release," and "[d]uring intoxication or withdrawal." (Ex. I to Am. Compl. at 3 (Section 4.10-D).) Mr. Short alleges that in light of these directives, "the Sheriff's employees and agents should have recognized" that Mrs. Short was at risk of suicide as she "had just arrived at the jail," "had serious medical issues [including] active withdrawal symptoms," and was to be released within forty-eight hours. (Am. Compl. ¶ 118.)

The policy also dictates that if a detainee or inmate is identified as a suicide risk, he or she should be "place[d] in a populated cell [and] (depending on the severity) never place[d] . . . in a single cell," the "nurse will be notified" depending on the severity, and "10-15 minute checks" should be initiated and logged. (Ex. I to Am. Compl. at 3 (Section 4.10-E).) Moreover, the policy required that any articles that "may be used to commit suicide" be removed from the detainee or inmate, and in underlined-and-bolded print noted that "**It is important to begin 10-15 minute checks on a suicidal inmate, even if he or she is in a multi-occupant cell. This must be documented.**" (Id. (Section 4.10-F, G).) Mr. Short alleges that despite these policies, Mrs. Short was not monitored, was placed in isolation, (id. ¶¶ 119-20, 126), and was given a bedsheet, resulting in her death, (id. ¶¶ 123, 126-27).

After Mrs. Short's suicide, an internal investigation concluded that no violations of policy occurred, though Mr. Short argued that the findings "show

11

either an utter lack of understanding of or any attempt to bother to actually review the records . . . or a willful attempt to cover up the choices[] made" by Defendants. (Id. ¶¶ 101-07.)  In February 2017, however, a newspaper reporter discovered Sheriff Hartman had not submitted proper paperwork about Mrs. Short's death to the North Carolina Department of Health and Human Services Division of Health Service Regulation ("DHSR"), which he was required to do. (Id. ¶ 108.)  The DHSR conducted its own independent death investigation after Sheriff Hartman's failure to timely submit the paperwork. (Id. ¶ 109.)  The investigation found that the Detention Center had failed to comply with 10A N.C. Admin. Code 14J.0601(c) because the Jail "should have observed [Mrs. Short] at least four times per hour" and they failed to report her death within five days. (Id. ¶ 110.)  Mr. Short filed suit alleging violations of state and federal law associated with the death of his wife.  Defendants have moved to dismiss pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.

A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is analyzed according to the same standard as a Rule 12(b)(6) motion.  Priority Auto Grp., 757 F.3d at 139 (citing Edwards, 178 F.3d at 244).  Generally, under Rule 12(b)(6), "courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" Zak v. Chelsea Therapeutics Int'l, Ltd., 780 F.3d

597, 606-07 (4th Cir. 2015) (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011)).

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). When the facts in the complaint are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557). Thus, if the well-pleaded facts only allow the court to infer that misconduct is "possible," the "complaint has alleged – but has not 'show[n]' – that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

### III. Individual Capacity Claims

In the Amended Complaint, Mr. Short has alleged two similar claims under 42 U.S.C. § 1983 against Defendants[4] in their official and individual capacities. Count Two alleges that Sheriff Stokes, Sheriff Hartman, Captain Sloan, Lieutenant Recktenwald, Sergeant Morgan, and Sergeant Meadows had "de facto" policies in effect that were a direct cause of the unlawful conduct of the officers and medical

---

[4] "Defendants" used in Sections III and IV refers to the individual defendants only.

13

care providers at the Detention Center, including the "de facto" policy of failing to train and supervise the detention officers and medical care providers at the Detention Center. (See Am. Compl. ¶ 140.)  Count Two further alleges that these Defendants had knowledge that the conduct of the officers and medical care providers at the Detention Center posed a risk of constitutional injury to inmates and detainees, and that their responses were so inadequate as to show deliberate indifference.  Count Two also alleges that these Defendants created a culture of neglect and indifference, to the point of covering up their violations, and that a "remotely appropriate" application of the policy for suicidal inmates would have prevented Mrs. Short's suicide. (Id. ¶ 144.)

The allegations in Count Three similarly describe "de facto policies"; namely, a "de facto" policy of failing to comply with the Detention Center policies (such as the Davie County Detention Center Health Services Policy for suicidal inmates) that were in place at the time. (See id. ¶ 150.)  Specifically, Count Three alleges that Sheriff Hartman, Captain Sloan, Lieutenant Recktenwald, Sergeant Morgan, Sergeant Meadows, and Officer Boger "had in effect de facto policies, practices and customs that were a direct and proximate cause of the . . . unlawful conduct of the officers or medical care providers who worked at the Jail." (Id. ¶¶ 149-50.) The wrongful conduct cited in Count Three includes, among other allegations, the "failure to comply with the proper methods or policies" for evaluating, assisting and treating mental health issues, suicide risk, and serious medical conditions "in

14

inmates and detainees at the Jail," and the failure to "ensure that inmates and detainees were provided appropriate . . . medical care." (Id. ¶ 150.)

Defendants filed the present Motion challenging the collective individual capacity claims in Counts Two and Three, arguing that "there are no specific factual allegations showing that these individual defendants were personally involved in the deprivation of M[r]s. Short's constitutional rights," and therefore are entitled to qualified immunity. (Motion at 2.)  As for the official capacity claims in Counts Two and Three against the officers of the Davie County Sheriff's Office, Defendants seek dismissal given that "there are no allegations that M[r]s. Short's death was caused by an official policy of the Davie County Sheriff's Office." (Id.)

Mr. Short, however, opposed Defendants' 12(c) Motion, challenging Defendants' reading of the Iqbal/Twombly standard and arguing that he "easily crossed the minimum threshold [required under Iqbal/Twombly] by alleging facts that 'plausibly suggest an entitlement to relief.'" (Pl.'s Mot. in Response to Def.'s 12(c) Motion [Doc. #61] ("Response to Mot.") at 3-10.)  Mr. Short also sought to distinguish between the facts of the cases cited by Defendants in support of their Motion and Mrs. Short's case, contending that the jury, rather than this Court, should determine whether Defendants acted with deliberate indifference towards Mrs. Short. (Id. at 6-10.)

Title 42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage[] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . [.]" See Grayson v. Peed, 195 F.3d 692 (4th Cir. 1999) (assessing deceased detainee's Constitutional claims under § 1983).  Individual capacity claims brought under § 1983 must allege a constitutional violation as to each defendant. See, e.g., Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).  A showing of respondeat superior is not sufficient for a § 1983 claim against an officer in his or her individual capacity; therefore, personal deprivation of a detainee's constitutional rights is required to be shown as to each defendant. Iqbal, 556 U.S. at 676; see also Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018) ("[T]he plaintiff must 'affirmatively show[] that the official charged acted personally in the deprivation of the plaintiff's rights.'") (quoting Wright, 766 F.2d at 850).

A. Claims against Sheriff Stokes, Sheriff Hartman, and Captain Sloan in their Individual Capacities

Neither Sheriff Stokes, nor Sheriff Hartman, nor Captain Sloan is alleged to have acted personally in the deprivation of Mrs. Short's rights.  They are not even alleged to have been present during her detention.  Instead, the allegations against each of them appear to be based on a theory of respondeat superior, which cannot be the basis for individual liability under § 1983.  Therefore, the § 1983 claims against Sheriff Stokes, Sheriff Hartman, and Captain Sloan in their individual capacities are dismissed with prejudice.

16

B. Claims against Lieutenant Recktenwald, Sergeant Meadows, Officer Boger, and Sergeant Morgan in their Individual Capacities

Unlike Sheriff Stokes, Sheriff Hartman, and Captain Sloan who are not alleged to have been present during Mrs. Short's detention, Lieutenant Recktenwald, Sergeant Meadows, Officer Boger—who is only named in Count Three—and Sergeant Morgan are alleged to have been present at various times in the Detention Center on August 23 and August 24, 2016, when Mrs. Short was taken into custody and/or while she was a detainee.  However, none of them is alleged to have personally deprived Mrs. Short of her constitutional rights as required for individual liability under § 1983.

In the context of a jail suicide, "[p]rison officials violate the civil rights of inmates when they display 'deliberate indifference to serious medical needs.'" Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  The relevant civil rights violation falls under the purview of the Eighth Amendment prohibition against "cruel and unusual punishment." Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("[A] prison official's 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.'") (quoting Estelle, 429 U.S. at 104).  In the case of a pretrial detainee, the issue is framed as a Due Process Clause violation, but the deliberate indifference analysis is the same. Gordon, 971 F.2d at 1094 ("Pretrial detainees . . . are entitled to medical attention, and prison officials violate detainees' rights to

17

due process when they are deliberately indifferent to serious medical needs.")
(citing Loe v. Armistead, 582 F.2d 1291, 1294 (4th Cir. 1978)).

For a deliberate indifference claim, the plaintiff must first allege facts
showing that the detainee suffered from a serious medical condition or injury. See
Grayson, 195 F.3d at 695; Clark v. M Dep't of Pub. Safety and Corr. Servs., 316
F. App'x 279, 283 (4th Cir. 2009) (unpublished). In the suicide context, this is
described as a "substantial risk of suicide," Brown, 240 F.3d at 389 (citing
Gordon, 971 F.2d at 1094), where the risk is "imminent" enough to be considered
actionable, Buffington v. Baltimore Cty., 913 F.2d 113, 120 (4th Cir. 1990)
("In Belcher [v. Oliver, 898 F.2d 32 (4th Cir. 1990)], we declined to impose on the
police officers a duty to screen detainees for suicidal tendencies, but we did not
imply that officers would have had no constitutional duty at all if they
demonstrably knew or had reason to know that a suicide was imminent.").

Second, the plaintiff must demonstrate that the officer subjectively knew of
both the serious medical condition and the excessive risk posed. Scinto, 841 F.3d
at 226; Gordon, 971 F.2d at 1095 (declining to find deliberate indifference for
officer who "had no knowledge of Gordon's suicide threat"). The officer must
"both be aware of facts from which the inference could be drawn that a
substantial risk of serious harm exists, and he must also draw the inference."
Farmer v. Brennan, 511 U.S. 825, 837 (1994); see also Rich v. Bruce, 129 F.3d
336, 339-40 (4th Cir. 1997). Courts evaluating the suicide of a detainee have
required that the defendant "actually knew of the detainee's suicidal intent, not

Case 1:18-cv-00741-NCT-JLW   Document 122   Filed 02/17/21   Page 18 of 29

merely that he should have recognized it." Hearn v. Lancaster Cty., 566 F. App'x 231, 236 (4th Cir. 2014) (emphasis added) (unpublished). In fact, "an officer's failure to appreciate a warning sign is not sufficient to establish deliberate indifference." Id. at 239. Similarly, an officer who has knowledge of underlying facts, but fails to recognize the risk those facts present will not satisfy the second prong of the deliberate indifference test. Rich, 129 F.3d at 338 (citing Farmer, 511 U.S. at 844).

Third, and finally, the officer in question must subjectively recognize that his or her actions were "inappropriate in light of that risk [of harm]." Rich, 129 F.3d at 340 n.2. Simply put, "[i]t is not enough that the official should have recognized that his actions were inappropriate; the official must have recognized that his actions were insufficient." Brown v. J.P. Morgan, No. 11-cv-3140 (JFM), 2013 WL 4026952, at *3 (D. Md. Aug. 6, 2013) (citing Brown, 240 F.3d at 390-91) (emphasis in original). Thus, "[e]ven officials who acted with deliberate indifference may be 'free from liability if they responded reasonably to the risk.'" Scinto, 841 F.3d at 226 (quoting Farmer, 511 U.S. at 844).

1.

Here, assuming arguendo that the first prong of a deliberate indifference claim is met, the factual allegations, taken in the light most favorable to Mr. Short, do not create a plausible inference that Lieutenant Recktenwald, Sergeant Meadows, or Officer Boger actually knew of or subjectively recognized Mrs. Short's suicidal intent, or that they ignored a serious need or imminent suicide risk.

19

There is no allegation that the arresting officers (who are not named as defendants) told anyone working at the Detention Center that Mrs. Short's husband and brother-in-law had stated, during her arrest, that Mrs. Short was suicidal.[5] Mrs. Short was evaluated by LPN Barnes, a member of the medical staff, within minutes of her arrival at the Detention Center. (Am. Compl. ¶¶ 11, 12.) LPN Barnes stated on the intake form that Mrs. Short was not in need of emergency care, that she had attempted suicide six weeks before, and that she was experiencing severe withdrawal symptoms. She also placed Mrs. Short on "detox protocol with withdrawal monitoring" but, despite knowing of Mrs. Short's recent suicide attempt, did not place her on monitoring for suicide. (Id. ¶¶ 39-46.) Further, it was LPN Barnes who approved Mrs. Short to be placed in an isolated cell. (Id. ¶ 73.)

On the other hand, there are no allegations that Lieutenant Recktenwald knew Mrs. Short was suicidal when she allegedly recommended Mrs. Short be placed in isolation because she was "being mouthy." The only allegation as to Sergeant Meadows is that Officer Cook asked her why Mrs. Short had been placed in a cell by herself, but Officer Cook does not remember who responded to her question. Thus, there are no allegations that Sergeant Meadows actually knew

_____

[5] The Amended Complaint alleges that the Davie County Sheriff's Department also responded to Mrs. Short's suicide attempt on July 6, 2016; however, Deputy Hannah Whittington responded to the call and Mrs. Short was sent by EMS to the hospital. Whittington is not mentioned as an officer who was present during the events on August 22 and 23, 2016.

Mrs. Short was suicidal. Although the jail staff should have observed Mrs. Short every fifteen minutes, there are no allegations or suggestions that Officer Boger knew Mrs. Short had attempted suicide six weeks before or that she was presently suicidal.

Moreover, "the mere failure" to comply with the protocol outlined in the Davie County policy manual or a comparable "statutory or administrative provision" is not, alone, "a constitutional violation." See, e.g., Davis v. Scherer, 468 U.S. 183, 194 (1984); see also Roberts v. City of Troy, 773 F.2d 720, 726 (6th Cir. 1985). Cf. Booker v. S.C. Dep't of Corr., 855 F.3d 533, 546 (4th Cir. 2017) (finding that internal regulations can be relevant, particularly in combination with binding case law, in determining a prisoner's claim for a constitutional violation). Failing to follow the policy is therefore a separate issue from violating Mrs. Short's constitutional rights given that the standard for a constitutional violation is not necessarily contained in the policy. See, e.g., Jackson v. Sampson, 536 F. App'x 356, 357-58 (4th Cir. 2013) (unpublished) (citing Gardner v. Howard, 109 F.3d 427, 430 (8th Cir. 1997)).

Even if these allegations were sufficient to show that these officers knew the risk of Mrs. Short's suicide, there are no allegations beyond what has been described above as to any specific defendant to plausibly infer that they subjectively recognized that their actions were inappropriate in light of that risk of harm. See Rich, 129 F.3d at 340 n.2. There are general assertions, such as "the Jail" had notice of Mrs. Short's withdrawal condition, "the Sheriff's agents and

21

employees" ignored the risk factors evaluated on the medical forms, and they "should have recognized" the risks.  As discussed in Iqbal and Twombly, such general assertions and "mere conclusory statements" are not sufficient to survive a motion to dismiss. Iqbal, 556 U.S. at 678.

2.

With respect to Sergeant Morgan, viewing the allegations in the light most favorable to Mr. Short, the claim is closer but similarly fails.  In the Amended Complaint, Mr. Short alleges that Sergeant Morgan partially completed two forms evaluating Mrs. Short's mental health and suicide risk and that the information on those forms show that Sergeant Morgan knew that Mrs. Short considered or attempted suicide "last month," had "stayed in [the] hospital [for] four days" for the suicide attempt, used "what[]ever [drugs] [she] c[ould] get [her] hands on," drank alcohol "every other day," had "sores all over body," and was "under the influence of or withdrawing from" "drugs." (Am. Compl. ¶¶ 62-67.)  And yet, Sergeant Morgan failed to refer Mrs. Short for further mental health evaluation as the form required.

However, Mr. Short also alleges in the Amended Complaint that Sergeant Morgan saw Mrs. Short after LPN Barnes had medically assessed her.  As a result of her assessment of Mrs. Short, LPN Barnes ordered only that Mrs. Short be placed on withdrawal protocol and moved to isolation, rather than be put on suicide watch.  When LPN Bailey took over LPN Barnes' shift, she "never

22

attempted to change any protocol[] [or] issue different instructions regarding [Mrs. Short] . . . [.]" (Am. Compl. ¶ 78.)

Deliberate indifference to a serious medical need requires an allegation showing that the defendant knew of the suicidal intent and its risk yet responded in a way that she recognized was inappropriate. See Farmer, 511 U.S. at 835-45. A failure to recognize warning signs of suicide is insufficient. Compare Hearn, 566 F. App'x at 233, 237-39 (upholding the district court's summary judgment dismissal of the plaintiff's claims despite the presence of a suicide note given that the note did not include "an explicit statement that [the plaintiff] was thinking about harming himself") with Gordon, 971 F.2d at 1095 (finding a definite, explicit warning from another officer that Gordon might kill himself, based on Gordon's threats prior to his arrest, was sufficient for finding the jailer knew of Gordon's suicidal tendencies). Likewise, "an officer's failure to alleviate a significant risk that [s]he should have perceived but did not" does not meet the deliberate indifference standard. Farmer, 511 U.S. at 838.

Sergeant Morgan's alleged conduct may have violated Detention Center policy, but it is not unconstitutional. She interacted with Mrs. Short after LPN Barnes had medically assessed her and ordered only withdrawal protocol and isolation. See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) (finding defendants lacked authority to interfere with plaintiff's medical treatment and may have incurred liability had they done so); Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) (declining to find supervisory liability where plaintiff-inmate received

23

Case 1:18-cv-00741-NCT-JLW   Document 122   Filed 02/17/21   Page 23 of 29

medical treatment and "[n]o record evidence suggests why [defendants] should not have been entitled to rely upon their health care providers' expertise).  And it is mere speculation to wonder what would have happened had Sergeant Morgan referred Mrs. Short for further mental health assessment.  Later when LPN Bailey took over from LPN Barnes, she made no changes to Mrs. Short's plan of care. See Grayson, 195 F.3d at 695-96 (declining to find deliberate indifference given that "the [correctional facility] [to which officers transported detainee] had trained medical personnel on duty 24 hours a day").

In sum, the allegations of deliberate indifference in violation of 42 U.S.C. § 1983 against Sheriff Stokes, Sheriff Hartman, Captain Sloan, Lieutenant Recktenwald, Sergeant Morgan, and Officer Boger in their individual capacities in Count Two and against Sheriff Hartman, Captain Sloan, Lieutenant Recktenwald, Sergeant Morgan, Sergeant Meadows, and Officer Boger in their individual capacities in Count Three are dismissed with prejudice.[6,7]

---

[6] Count Two also alleges a failure to train violation of § 1983 against these Defendants in their individual capacity; however, a failure to train claim is more appropriately assessed as an official capacity claim. See City of Canton v. Harris, 489 U.S. 378, 380-81 (1989) (assessing failure to train claim under § 1983 against municipality rather than against officers in their individual capacities)

[7] Defendants assert they are protected by qualified by qualified immunity, (see Motion at 2); however, because the Court has found Mr. Short did not sufficiently allege that there was a constitutional violation, it need not reach the question of qualified immunity.

24

IV.    Official Capacity Claims

As noted previously, Defendants contend that the official capacity claims fail in part because it would be "axiomatic" for the Court to conclude that no constitutional violation occurred, yet hold the Sheriff of Davie County liable under § 1983 and in part because Mr. Short "failed to allege that any official policy the Sheriff of Davie County caused M[r]s. Short's death." (Motion at 18-20.)  Mr. Short did not seem to directly challenge these arguments in the official capacity context, but pointed, for example, to "a specific detention policy relative to treatment of those in custody where there was any indication of possible suicide including specifically any past attempt," (Response to Mot. at 9.), while reiterating that a constitutional violation had in fact occurred and been sufficiently pled. (Id. at 4-10.)

A suit against an officer in his or her official capacity is a suit against the municipality or, in this case, the Sheriff of Davie County.[8] See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985); Gant v. Whitaker, 203 F. Supp. 2d 503, 508 (M.D.N.C. 2002), aff'd, 57 F. App'x 1441 (4th Cir. 2003).  To impose liability on a municipality, a plaintiff must allege that a policy or custom of the municipality caused the plaintiff's constitutional deprivation. Monell v. N.Y. City Dep't of Soc.

---

[8] The Amended Complaint notes that Sheriff Stokes retired on December 31, 2016, and then-Chief Deputy J.D. Hartman became Sheriff of Davie County. (Am. Compl. at 3 n.1.)

Case 1:18-cv-00741-NCT-JLW   Document 122   Filed 02/17/21   Page 25 of 29

Servs., 436 U.S. 658, 690-91 (1978); Owens v. Baltimore City State's Attorney's Office, 767 F.3d 379, 402-03 (4th Cir. 2014). "[S]upervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages." Waybright v. Frederick City, 528 F.3d 199, 203 (4th Cir. 2008) (emphasis added) (quoting City of L.A. v. Heller, 475 U.S. 796, 799 (1986)). Mr. Short seems to allege that Defendants' policy or custom that caused Mrs. Short's suicide was the policy of failing to supervise or train employees and the pattern of non-compliance with the Detention Center's established policies regarding suicidal detainees.

To assert a failure-to-train claim pursuant to § 1983, a plaintiff must show that a municipality's "failure to train its employees . . . reflects a deliberate indifference on the part of the local government to the rights of its citizens, that is, only where a failure to train reflects a deliberate or conscious choice by the local government." Cortez v. Prince George's Cty., 31 F. App'x 123, 129 (4th Cir. 2002) (unpublished) (citing Harris, 489 U.S. at 388). Thus,

> a plaintiff must plead that: "(1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to properly train the subordinates, illustrating a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights."

Brown v. Mitchell, 308 F. Supp. 2d 682, 701-702 (E.D. Va. 2004) (citing Harris, 489 U.S. at 388-92).

To state a failure to supervise claim, a plaintiff must show

26

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injuries to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction <u>and the particular constitutional injury suffered</u> by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal citations omitted).

As emphasized in each of these standards, a constitutional injury is required in order to hold a municipality liable in a § 1983 claim.  The Court has already determined that Mr. Short has not sufficiently alleged that any individual defendants violated Mrs. Short's constitutional rights.  Thus, while the Amended Complaint describes a horrible tragedy and may allege torts that are actionable under North Carolina law, it does not sufficiently allege a violation of 42 U.S.C. § 1983.  Therefore, Plaintiff's claims in Counts Two and Three against all individual Defendants in their official capacities under 42 U.S.C. § 1983 are dismissed with prejudice.[9]

_____

[9] Mr. Short also alleged § 1983 claims against John and Jane Doe in their individual and official capacities.  Those claims are also dismissed. See Goodwin v. Beasley, No. 1:09-cv-151 (WWD), 2010 WL 2539795, at *6 (June 18, 2010 M.D.N.C.) (allowing claims against unidentified defendants "if it appears that the true identities of the unnamed parties can be ascertained through discovery or through the intervention of the court") (quoting Schiff v. Kennedy, 691 F.2d 196, 197-98 (4th Cir. 1982)); Waller v. Butkovich, 584 F. Supp. 909, 920 n.1 (M.D.N.C. 1984) (permitting claims against unidentified defendants if wrongful conduct is clear from the allegations in the complaint).

27

## V.    Claims under North Carolina State Law

Having dismissed all of the claims under federal law and recognizing that the remaining claims operate purely under state law principles, the Court declines to exercise jurisdiction over them. 28 U.S.C. § 1367(c)(3); see also Shanaghan v. Cahill, 58 F.3d 106, 109 (4th Cir. 1995) (finding that "federal courts generally have discretion to retain or dismiss state law claims when the federal basis for an action drops away").  The state law claims are dismissed without prejudice to afford Mr. Short an opportunity to refile his claims in state court within thirty days. 28 U.S.C. § 1367(d); Artis v. District of Columbia, 138 S. Ct. 594, 199 L. Ed. 2d 473 (2018).

## VI.

For the reasons explained in this Memorandum Opinion, IT IS HEREBY ORDERED that the Motion for Judgment on the Pleadings Pursuant to Rule 12(c) on behalf of Defendants Sheriff Stokes, Sheriff Hartman, Captain Sloan, Lieutenant Recktenwald, Sergeant Morgan, Sergeant Meadows, Officer Boger, and Western Surety Company [Doc. #54] is GRANTED IN PART as to the federal claims and DENIED IN PART AS MOOT as to the state claims.  IT IS FURTHER ORDERED that Counts Two and Three alleging violations of 42 U.S.C. § 1983 are DISMISSED WITH PREJUDICE, and Counts Eight, Nine, and Ten alleging violations of state law

are DISMISSED WITHOUT PREJUDICE.

This the 17th day of February, 2021.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge